[No. B127987. Second Dist., Div. Five. Feb. 24, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY GADLIN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

588

## COUNSEL

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Victoria Bedrossian and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### O'NEILL, J.*—

#### I.  PROCEDURAL HISTORY

Defendant Gregory Gadlin was sentenced to 35 years to life in state prison following conviction by jury of attacking his live-in girlfriend with a knife, in violation of Penal Code section 245, subdivision (a)(1). The same jury sustained allegations of two prior felony convictions, charged as both strike priors (Pen. Code, § 667, subds. (b)-(i)) and serious felony priors (Pen. Code, § 667, subd. (a)(1)). Those priors were a 1984 forcible rape (Pen. Code, § 261, former subd. (2)) and a 1986 forcible child molestation (Pen. Code, § 288, subd. (b)). He now challenges four rulings made by the trial court. We affirm.

In the published portion of the opinion, we hold that expert testimony on the effects of domestic battery on a victim (battered women's syndrome) was properly admitted, even though the victim was not recanting at trial. The syndrome testimony was probative regarding both the victim's recantation of a prior incident and her decision to resume the relationship with the defendant before the charged incident.

---

*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## II. STATEMENT OF FACTS

We summarize the evidence in the light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560]; *People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

Defendant and victim Tamara R. had a troubled, "off-again, on-again" relationship for two and one-half years beginning in the fall of 1992, when defendant moved into the victim's home. She had also dated defendant for a month in 1986.[1]

*Uncharged Act*

Early on June 11, 1993, defendant came home under the influence of drugs. An argument and physical altercation followed. The victim armed herself with an eight-inch butcher knife and hammer after defendant tried to choke her. Defendant took the weapons, dragged the victim into the bedroom, and was holding the knife to her neck when the police arrived. Defendant dropped the knife after threatening to be killed rather than go to jail.

The victim told the police she was extremely afraid of defendant, and that he was constantly terrorizing her and her children. However, later in 1993 she wrote a letter to the parole board claiming to have been the aggressor and blaming herself for the relationship problems. The victim explained at the present trial that the letter was entirely false, having been concocted by her and defendant in an attempt to minimize defendant's custody time for violating parole.

*Charged Offense*

Following defendant's parole violation time for the 1993 incident, he moved back in with the victim and the intimate relationship resumed. On the night of July 26, 1994, an argument occurred when the victim suggested that the relationship should end. Defendant pushed the victim to the bedroom floor, held her down, and pulled a knife from under the mattress. Defendant cut the victim from her temple to the middle of her cheek, and on her back, neck, abdomen, and three fingers. Defendant threw the bloody, seven-inch knife on the living room floor and ran out the door.

The victim's injuries required 48 stitches in the head and neck area and several bandages. Scars were still visible at the trial over four years later.

---

[1] The record shows defendant spent much of the intervening time in state prison, but the jury was not so informed.

*Other Evidence*

The victim next heard from defendant by telephone on two occasions in 1996, approximately 18 and 21 months after the charged attack. In February of 1998 she received a letter from defendant explaining that he had moved out of state and had been working in Atlanta, Georgia before turning himself in to face the California charges. He did so for religious reasons. Defendant suggested that the victim not come to court so that the charges would be dropped.[2] Defendant apologized and asked for forgiveness, and professed his continuing love for the victim. He stated he had fathered a child out of wedlock in Georgia, and named her "Tamara."

Gail Pincus, a licensed clinical social worker who specialized in domestic violence, testified as an expert concerning the three-phase cycle of violence that typically occurs in battering relationships.[3] The cycle includes the tendency of a victim to recant in order to protect the batterer and rationalize a victim's decision to resume the relationship. A victim who has little or no contact with the batterer for a period of time may be able to break the cycle of violence.

The defense called no witnesses.

### III.   DISCUSSION OF UNPUBLISHED ISSUES*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

### IV.   ADMISSION OF EXPERT TESTIMONY ON EFFECTS OF DOMESTIC BATTERING

Defendant contends the trial court improperly admitted irrelevant expert testimony explaining what is commonly called the battered women's syndrome (BWS).[4] He also argues that the testimony as given exceeded the scope allowed by statutory and case law.[5] The People offered the expert testimony because they correctly anticipated the defense attack on the

---

[2] This was apparently a reference to the upcoming preliminary examination, which took place on March 30, 1998.

[3] The same expert testified in *People v. Gomez* (1999) 72 Cal.App.4th 405 [85 Cal.Rptr.2d 101]. See pages 410-414 of that opinion for a detailed summary of the testimony, which was similar to that given in the present case.

*See footnote, *ante*, page 587.

[4] Concerning the appropriate nomenclature, see *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083-1084, footnote 3 [56 Cal.Rptr.2d 142, 921 P.2d 1].

[5] We intend to reach all aspects of the relevance issue, even though defendant made a very narrow objection. In response to the People's in limine motion to present the evidence, counsel stated, "The only issue I would raise is . . . ," and went on to note that the present

victim's credibility based on her written recantation of the 1993 incident and her decision to reunite with defendant after he had served time for the 1993 attack.

■ Although BWS evidence was not necessarily inadmissible under California case law, the Legislature codified its admissibility by enacting Evidence Code section 1107, effective January 1, 1992. That section provides in pertinent part:

"(a)  In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.

"(b)  The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven." Accordingly, a properly qualified expert may testify to BWS when it is relevant to a contested issue at trial other than whether a criminal defendant committed charged acts of domestic violence. (*People v. Humphrey, supra,* 13 Cal.4th at pp. 1076, 1082; *People v. Gomez, supra,* 72 Cal.App.4th at p. 415; *People v. Morgan* (1997) 58 Cal.App.4th 1210, 1213-1217 [68 Cal.Rptr.2d 772].) We focus on the relevance and scope issues, as there has been no challenge to the expert's qualifications.

*Relevance*

We see two major components to a relevance analysis in this context. First, there must be sufficient evidence in the particular case to support a contention that BWS applies to the woman involved. (*People v. Gomez, supra,* 72 Cal.App.4th at p. 415.) Second, there must be a contested issue as to which BWS testimony is probative. (Evid. Code, § 801.)

victim was not recanting at trial, although she had done so five years earlier after the uncharged incident. He stated he was uncertain as to how the expert would testify about that scenario, and suggested that the BWS testimony "is not really going to make a whole lot of sense in terms of reconciling the behavior of the alleged victim in two different instances. [¶] I'll submit." Judging by the cross-examination of the expert, counsel may have seen potential benefits for the defense from the testimony, particularly insofar as it tended to emphasize the issue of the victim's credibility. Nonetheless, we find the objection sufficient since counsel did raise a relevance question, and because of the importance of the issue.

■ Defendant relies on *People v. Gomez* in support of his argument that the People fell short on the first component. In *Gomez*, another division of this court recently held that BWS evidence was improperly admitted in a case involving only one incident of battery which was recanted at trial. (*People v. Gomez, supra*, 72 Cal.App.4th at p. 411.) The defense also asserts that the present evidence fails to qualify under a definition of BWS which appears in *People v. Humphrey, supra*, 13 Cal.4th at pages 1083-1084: "Battered women's syndrome 'has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." (*State* v. *Kelly* (1984) 97 N.J. 178, 193 [478 A.2d 364, 371]; [citations].)' [Citations.]" (*Ibid.*)

The present case is distinguishable from *Gomez* and does no violence to the *Humphrey* definition. The evidence established not only two distinct, well-corroborated incidents of armed assault, but that after the 1993 event, the victim reported being "extremely afraid of suspect and that he constantly terrorizes her and her children." It was also proved that the relationship lasted, off and on, for two and one-half years, and was "troubled." Further, despite the 1993 incident, the victim reunited and resumed intimate relations with defendant before the charged incident in 1994.

Had there been a specific objection at trial concerning the length of the relationship or the extent of the abuse, we would undoubtedly know more about the frequency of the couple's interactions and what the victim meant when she said defendant "constantly terrorizes her and her children."[6] On this record, we accept that testimony at face value. Such conduct, as exemplified by the two incidents of armed assault, established the necessary pattern of abuse.

The present facts are much more like those of *People v. Morgan*, than those of *Gomez*. *Morgan* involved an alleged victim who recanted at trial after reuniting with the defendant, despite having reported a battery and displayed visible injuries on the night of the alleged offense. (*People v. Morgan, supra*, 58 Cal.App.4th at pp. 1212-1213.) The victim in *Morgan* had also told a police investigator that she had been hit in the past "but never as badly as on this occasion." (*Id.* at p. 1213.) The facts of *Morgan* also included a victim-defendant relationship of similar duration to the present case, as well as observations by a responding police officer that corroborated the initial battery report. (*Id.* at pp. 1212-1213.)

As for the "extended period of time" required by *Humphrey*, we note that *State v. Kelly, supra*, 97 N.J. 178, 193 [478 A.2d 364, 371], the New Jersey

---

[6]*Ante*, footnote 5.

Supreme Court case from which our Supreme Court quoted goes on to say, " 'Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.' " (*Ibid.*) The New Jersey Supreme Court was quoting from page xv of The Battered Woman (1979) by Dr. Lenore Walker, "a prominent writer on the . . . syndrome." (478 A.2d at p. 371.) We agree with Dr. Walker, and hold that the evidence in the present case was sufficient to support the People's contention that BWS applied to the victim during the time of her relationship to defendant.

■ Turning to whether BWS testimony was probative on a contested issue, defendant argues that a prior recantation which is disavowed at trial by an alleged victim, who is then cooperating with the prosecution, does not support admissibility. While that might be true in some situations, we disagree as to the present case.

Both sides sought admission of the prior incident, and the recantation was pivotal in the defense attack on the victim's credibility. As defense counsel stated in opening statement, "The very foundation of this case, is going to be the credibility of [the victim]. . . . [¶] . . . Basically the decision that you're going to make is going to rest very heavily on the testimony of [the victim]." Counsel stuck to that theme throughout the trial, arguing it heavily in summation. He repeatedly urged the jury to conclude that the victim was an armed aggressor during the charged incident, just as she once claimed to have been the aggressor in the similar 1993 incident. Further, the victim's resumption of an intimate relationship with defendant shortly before the charged incident was also a significant evidentiary fact.

BWS evidence speaks directly to both recantation and reunion by a domestic abuse victim, especially where such actions are used to attack her credibility. (*People v. Morgan, supra,* 58 Cal.App.4th at pp. 1215-1217.) It was properly admitted here despite the victim's cooperation with the prosecution at the trial because the attack on her credibility was based on her state of mind at the time of the charged and uncharged incidents. As we have noted, the victim was a battered woman at that time.

Defendant also contends BWS testimony was not probative on the present facts because the victim testified she and defendant worked together to falsify the recantation letter and that its purpose was to shorten defendant's custody time. Defendant concludes from this testimony that the letter could

not have been the product of BWS. We disagree. As recognized by the text of Evidence Code section 1107, subdivision (a), BWS testimony is relevant to the motive for a victim's recantation, regardless of its mechanics. We see no distinction between the recantation in the present case and other forms of similar conduct, most if not all of which have the effect of assisting the perpetrator in escaping the consequences of his actions.

*Scope*

Defendant repeatedly objected to the scope of the expert's testimony, as violating the proscription in Evidence Code section 1107, subdivision (a) against offering BWS testimony "against a criminal defendant to prove the occurrence of the act or acts of abuse . . . ." These objections occurred during the expert's testimony about the cycle of domestic violence, which included an explanation of the effect on the victim of typical abuser behaviors. The trial court initially overruled, then cautioned the jury that the testimony about abuser behavior was not based on the facts of the present case.[7] The trial court responded to two further objections by ordering the prosecutor to complete the general testimony and focus on the behavior of battered victims.

While it is true that BWS testimony can be powerfully prejudicial when its legal bounds are exceeded (see *People v. Gomez, supra,* 72 Cal.App.4th at pp. 418-419), we find no abuse of discretion in the trial court's present rulings. When BWS testimony is properly admitted, testimony about the hypothetical abuser and hypothetical victim is needed for BWS to be understood. To the extent that the expert testimony suggests hypothetical abuse that is worse than the case at trial, it may even work to the defendant's advantage. In any event, limiting the testimony to the victim's state of mind without some explanation of the types of behaviors that trigger BWS could easily defeat the purpose for which the expert is called, which is to explain the victim's actions in light of the abusive conduct.

Accordingly, we see no abuse of discretion in the trial court's having initially allowed some leeway in the prosecution questioning of the expert, then limiting the testimony and cautioning the jury in response to later objections.

---

[7]The trial court stated, "All right. We are going to overrule that, but this is foundational only. Based to lay a foundation for an opposing opinion later. We'll make it real clear this is not based on any fact that is shown to this witness at this juncture." This admonition was not a model of clarity, but sufficiently conveyed the intended message.

## V.  Disposition

The judgment is affirmed.

Turner, P. J., and Godoy Perez, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 2, 2000.