[No. B130417. Second Dist., Div. Four. Mar. 6, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
BYRON KEITH WILLIAMS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts C, D, E, F and G in the Discussion.

**COUNSEL**

Kevin C. McLean, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Sanjay T. Kumar and G. Tracey Letteau, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HASTINGS, Acting P. J.**—Appellant contends that the trial court errone-ously denied his *Wheeler* motion,[1] his conviction was not supported by substantial evidence, cumulative evidentiary errors and pervasive prosecuto-rial misconduct require reversal, and cross-examination was unduly re-stricted. We conclude that the trial court erred with regard to the *Wheeler* challenge but that none of appellant's other arguments have merit. We therefore conditionally reverse the judgment and remand the matter to the trial court for further proceedings. Depending on the findings of the trial court, the judgment shall either be reinstated or a new trial ordered.

### BACKGROUND

On September 4, 1998, appellant, Byron Keith Williams, was charged by information in count 1 of inflicting corporal injury on his spouse, in viola-tion of Penal Code section 273.5, subdivision (a), and in count 2 of assault with a deadly weapon by means of force likely to produce great bodily injury, in violation of Penal Code section 245, subdivision (a)(1). The information alleged as to count 2 that appellant personally used a dangerous and deadly weapon, within the meaning of Penal Code section 1192.7, subdivision (c)(23); and as to both counts 1 and 2, that appellant personally inflicted great bodily injury upon the victim, within the meaning of Penal Code section 12022.7, subdivision (d).

A jury convicted appellant of both counts, and found the additional allegations to be true. On March 3, 1999, the trial court suspended imposi-tion of sentence, placed appellant on formal probation for a period of five years, and ordered appellant to serve 365 days in the Los Angeles County jail. His notice of appeal was filed the same day.

A. *The Prosecution's Case*

1. *Testimony of Siobhan Williams[2]*

Appellant's wife, Siobhan, testified that she and appellant began arguing at approximately 6:30 a.m. on June 3, 1997, after she noticed that he had

---

[1]See *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], and our discussion within.

[2]We shall henceforth use just the first name, Siobhan, to avoid confusion with appellant.

taken $120 from her purse to pay the gardener. After about 20 or 30 minutes, Siobhan decided to leave. She dressed, put her purse and her four-year-old son Lee in the car, and returned to her bedroom to get some clothes. When she told appellant she was leaving, he stomped, said, "You're not leaving," blocked her way, and grabbed her wrists and arms. She tried to get away from him but found the television blocking her way. While appellant held her by the arm, she grabbed the metal footboard of their king-size bed, picked it up, and used it to hit the desk near the keyboard of appellant's computer. This further angered appellant. He pulled the footboard from her hand and hit her in the face with it. Siobhan felt pain and grabbed her face. Appellant hit her again with the footboard, this time across her arms and chest, causing her to bend over and fall.

Siobhan could not breathe after the second blow, and her hands were full of blood. She saw appellant raise the footboard and said, "Don't hit me, my mouth." Appellant then put the board down. Siobhan dropped to the floor, crying, and appellant said, "I will call 911." He took the car keys out of her hand and left. After a few minutes, she went into the bathroom. When she looked in the mirror and saw blood coming from her mouth and nose, she screamed or yelled, but appellant did not return. Siobhan remained in the bathroom for about 30 minutes trying to stop the bleeding. She then went downstairs where she found the front door wide open and no one in the house but her four-year-old son, Lee. Her car was no longer in the driveway. Her purse, with her medical cards in it, had been left in the car and was gone with it.

Siobhan called her employer, put some ice in a towel, and waited on the couch, thinking appellant had gone to get help. She fell asleep, and when she awoke about four and one-half hours later, there was still no one else there, except Lee. Upon awakening, Siobhan found a message from appellant on her answering machine telling her that the car was parked around the corner. She went to the car and drove to a dentist. The dentist pulled one damaged tooth, replacing it with a removable tooth plate, and did a root canal on another, which later turned black. Her treatment that day took about five hours. She was prescribed pain medication and antibiotics and left the dentist about 9:00 p.m.

The next day, her brother and his wife took her to the police station, where they waited about three hours for someone to take a report, to no avail. Siobhan was not feeling well, so she went home, and went to bed. Her brother called the police, and woke her when they came.

Siobhan allowed appellant to move back into the home about one month after the incident, and they separated again in March 1998. Although they were still married at the time of trial, they were not living together.

## 2. Testimony of Other Witnesses

Los Angeles County Sheriff's Deputy Craig Parkhill went to the Williams home on June 5, 1997, and spoke to Siobhan for about 20 minutes. Deputy Parkhill recounted what Siobhan had told him, which was, with some exceptions, which we will discuss below, consistent with her testimony at trial. Parkhill observed Siobhan's injuries, including those to her mouth and face, and also a large bruise near her clavicle, under her right shoulder.

Cathy Tucker, a licensed dental assistant employed in the dental office where Siobhan sought treatment, testified. She first gave factual testimony that Siobhan came into the office at 4:20 p.m., on June 3, 1997, with a split lip, a significantly swollen mouth, extensive bleeding, and a loose tooth. Siobhan was given emergency treatment, consisting of an exam, X-rays, tooth extraction, root canal, and insertion of a stay plate. The treatment took four and one-half hours. Tucker then gave expert testimony: based upon her observation of approximately 200 impact injuries, she opined that Siobhan's injuries were caused by a high-impact blow, rather than a low-impact blow.

Sergeant Corey Kennedy of the Los Angeles County Sheriff's Department testified that he conducted a videotaped interview of Siobhan on June 18, 1997. An edited version of the tape was played for the jury.

Jeri Darr, a domestic violence counselor, testified on rebuttal that it is not unusual for a victim of domestic violence to lie or not tell his or her spouse's family and others about the abuse, due to feelings of shame and fear of isolation. A victim is much more likely to tell the truth within the first 24 to 48 hours after an attack.

## B. The Defense

### 1. Appellant's Testimony

Appellant testified that it was he who had put Lee in the car, because he was going to take him to preschool. At the time, Siobhan was still in bed, but got up and yelled at him when she saw him take money from her purse for the gardener. In her anger, she moved about the bedroom, pushing furniture. He denied touching her, and claimed he was busy trying to catch everything she pushed. He denied ever standing in front of the doorway, or preventing his wife from leaving the room. He said that when Siobhan picked up the footboard, it appeared she was trying to smash the computer, so he grabbed it. He pulled in one direction, and she pulled in another. Siobhan was accidentally hit with it when she suddenly let go, causing him to stumble

back and the end of the footboard caught her in the mouth. He denied intentionally hitting her, and claimed she was struck just this one time. As a result of this blow, Siobhan fell to the side and held her mouth. Appellant asked her if she was all right, and tried to turn her over to see if there was any damage. She glared at him, got up, and walked into the bathroom without saying anything. He did not see blood on her face, but he admitted he did not get a good look at her face. He did not think she was badly injured.

Appellant went downstairs, took Lee out of the car, put him in the house, and drove away. He claimed he closed the front door, and denied that he took the car keys from Siobhan's hand after she was injured. Instead, he took the keys out of his wife's purse earlier while in the bedroom when he took the money for the gardener. He denied taking her medical cards with him. He drove around for awhile, then called home from a telephone booth, hanging up when the answering machine picked up. Appellant called again at approximately 10:00 a.m., left a message that he was going to return the car. Later, he called again, leaving the message about where he had left the car, and that the keys were in the ashtray.

Appellant went to stay with friends in Whittier. He had no further contact with his wife for approximately one month. Siobhan later asked him to move back in, and he did. He told her that he thought the incident had been an accident, and she said nothing either in contradiction or agreement.

### 2. *Mother's Testimony*

Appellant's mother, Jean Williams-Oliver testified that Siobhan told her the incident was an accident, and that Siobhan has since then asked her for money.

## DISCUSSION

### A. *The Wheeler Issue*

 After the prosecution had excused two men from the jury panel, appellant objected, citing *People v. Wheeler, supra,* 22 Cal.3d 258. Appellant's counsel argued that the prosecution was systematically excluding men from the jury panel. The trial court refused to consider the motion because it did not consider men to be a cognizable group falling within the scope of a *Wheeler* objection.

 Wheeler prohibits the use of peremptory challenges to exclude all or most members of an identifiable group of citizens on racial, religious, ethnic,

or other similar grounds, solely because of a presumed "group bias." (22 Cal.3d at p. 280; see also *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 1719, 90 L.Ed.2d 69].) There is a rebuttable presumption that a peremptory challenge has been made on a constitutionally permissible ground. (*People v. Wheeler, supra,* 22 Cal.3d at p. 278.) To overcome the presumption, the party making a *Wheeler* motion carries the initial burden to establish a prima facie case of group bias. (*People v. Arias* (1996) 13 Cal.4th 92, 134-135 [51 Cal.Rptr.2d 770, 913 P.2d 980].) To establish a prima facie case, the moving party is required not only to show that the persons excluded were members of a cognizable group; he must also show, from all the circumstances of the case, a strong likelihood that such persons were being challenged because of their group association. (*People v. Welch* (1999) 20 Cal.4th 701, 745 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Once a prima facie case is established, the burden shifts to the other party to show that the peremptory challenges were not based on group bias. (*People v. Motton* (1985) 39 Cal.3d 596, 600 [217 Cal.Rptr. 416, 704 P.2d 176].) The errone-ous denial of a defendant's *Wheeler* motion is reversible error per se. (*People v. Wheeler, supra,* 22 Cal.3d at p. 281.)

 Here, the trial court erred when it refused to consider the *Wheeler* challenge. Peremptory challenges may not be used to exclude male jurors solely because of a presumed group bias. (*People v. Cervantes* (1991) 233 Cal.App.3d 323, 332 [284 Cal.Rptr. 410].)

Respondent concedes the error but contends that reversal is not required because appellant failed to overcome the presumed validity of the prosecu-tion's peremptory challenges. The problem with the argument is that by failing to recognize gender as an appropriate basis for a *Wheeler* challenge, the trial court failed to address the first issue, whether a prima facie case had been established. The refusal to consider a *Wheeler* motion altogether is also reversible error per se. (See *People v. Gore* (1993) 18 Cal.App.4th 692, 705 [22 Cal.Rptr.2d 435].)

Respondent has requested that instead of outright reversal we remand for a further hearing on the issue. Such a remand may be ordered in appropriate cases. (*People v. Gore, supra,* 18 Cal.App.4th at p. 706.)[3] Ordinarily, factors to be considered in determining whether remand is appropriate are the length of time since voir dire, the likelihood that the court and counsel will recall the circumstances of the case, the likelihood that the prosecution will remember the reasons for the peremptory challenges, as well as the ability of the trial judge to recall and assess the manner in which the prosecutor examined the venire and exercised other peremptory challenges. (*People v.*

---

[3]Appellant has not objected to this request.

*Rodriguez* (1996) 50 Cal.App.4th 1013, 1024-1025 [58 Cal.Rptr.2d 108].) Under the circumstances present, we agree that remand is appropriate. (See *People v. Garcia* (2000) 77 Cal.App.4th 1269, 1281-1282 [92 Cal.Rptr.2d 339, 348].)

### B. *The Testimony of Domestic Abuse Counselor Jeri Darr*

■ Citing *People v. Gomez* (1999) 72 Cal.App.4th 405, 415-416 [85 Cal.Rptr.2d 101], appellant contends that the testimony of domestic abuse counselor Jeri Darr concerning battered women's syndrome was irrelevant because there was no evidence of prior incidents of abuse.

Initially, we conclude that appellant has failed to preserve this issue for appellate review. Ms. Darr was offered as an expert on domestic violence during rebuttal. Appellant objected to Darr's testimony on two grounds. First, he objected to her qualifications as an expert; and second, he objected on the basis that the subject of Darr's opinion, why battered women lie and return to their husbands, is not beyond the natural and common experience of the jury to require expert testimony. His failure to object on the ground he now asserts waived the issue for review on appeal. (*People v. Coleman* (1988) 46 Cal.3d 749, 777 [251 Cal.Rptr. 83, 759 P.2d 1260].) However, recognizing that *People v. Gomez* was decided after this matter had been tried, we will address the issue raised by appellant to forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel.

After an Evidence Code section 402 hearing, the trial court in this instance limited the testimony of Ms. Darr to why women may return to a man who has battered them and why that same person may lie, misstate, or misspeak about the incident. Ms. Darr then gave testimony which established that she has training and experience as a domestic violence counselor and that she had testified as an expert in prior court proceedings. She gave general testimony why victims of domestic violence may stay in a "battering relationship" and why victims may or may not be as forthcoming as the general public may expect in divulging information about incidents. The following exchange is important to the issues to be addressed:

"Q. BY Ms. BROOKS [prosecutor]: Do you find that in your experience that . . . after the initial incident that there is a window where [the victim] will tell the truth versus months later?

"A. Yes.

"Q. Explain how that works.

"· · · · · · · · · · · · · · · · · · · · · ·

"THE WITNESS: It's been my experience that if you can reach a victim within 24 to 48 hours after the incident has occurred they're far more likely to tell the truth. That's based on my experience with doing the enhanced response team with the Sheriff's Department.

"Given time and consideration, they have had contact with the abuser after that fact, perhaps the abuser's family has called them or their own family has called them to talk them into changing their story. If they have had time to think about the ramifications. If they don't work, they might not have a way to put food on the table or keep the roof over their head. The longer they have to sit with that, the more likely it is that they would become more recalcitrant.

"Q. BY MS. BROOKS: And do you find when they are removed from that contact with, as you describe, possibly the abuser or the abuser's family, that cut-off is made, they tend to be honest about what's happened or still recalcitrant once they have been separated from that situation?

"A. Much more likely to be honest.

"Q. Now you're not saying every battered woman tells the truth all the time, are you?

"A. Nope.

"Q. In fact, don't they lie on occasion?

"A. Yes, they do.

"Q. And you find, based on the statement that you just made, that they're more likely to be honest after the separation or 24 to 48 hours after the incident?

"A. Yes.

"Q. And while they're—do women, in your experience, go, back to their abusers?

"A. Do they go back? Yes, they do.

"Q. Why do they go back, based on your training and experience?

"A. Because they love them, they're not sure how they can survive on their own, pressure from family and friends, or because [their] children want to be with their father."

The California Legislature has expressly authorized this type of expert evidence by enactment of Evidence Code section 1107:

"(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.

"(b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on battered women's syndrome shall not be considered a new scientific technique whose reliability is unproven.

"(c) For purposes of this section, 'abuse' is defined in Section 6203 of the Family Code and 'domestic violence' is defined in Section 6211 of the Family Code.

"(d) This section is intended as a rule of evidence only and no substantive change affecting the Penal Code is intended."

Family Code section 6203 states: "For purposes of this act, 'abuse' means any of the following: [¶] (a) Intentionally or recklessly to cause or attempt to cause bodily injury. [¶] (b) Sexual assault. [¶] (c) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (d) To engage in any behavior that has been or could be enjoined pursuant to Section 6320." Family Code section 6211, as pertinent states: " 'Domestic violence' is abuse perpetrated against any of the following persons: [¶] (a) A spouse or former spouse."

It is clear that the evidence proffered here meets the specifications of the statute. Ms. Darr was called to the stand on rebuttal after Siobhan's credibility was placed in issue on cross-examination by appellant's trial counsel. He brought out various inconsistent statements attributed to Siobhan regarding the incident to suggest that the injury inflicted on her was accidental. The evidence was also appropriate to explain why Siobhan allowed appellant to return to the family residence.

In *People v. Gomez, supra,* 72 Cal.App.4th 405, the trial court had allowed similar testimony in a spousal abuse case. The Court of Appeal, recognizing the existence of Evidence Code section 1107, concluded that the evidence

admitted was irrelevant because there was no showing of prior domestic violence between the husband and wife to establish that the victim in that case was a battered woman: "Here, other than evidence of the present incident, there is no evidence indicating that [the husband] abused or behaved violently toward [the wife]. There is no evidence that [the husband] fit the profile of a batterer, or that [the wife] and [the husband] were engaged in a 'battering' relationship. On this record, [the expert's] testimony regarding battered women's syndrome was irrelevant." (72 Cal.App.4th at p. 417.)

In reaching this decision, the Court of Appeal cited and relied upon the definition of "battered women's syndrome" in *People v. Humphrey* (1996) 13 Cal.4th 1073 [56 Cal.Rptr.2d 142, 921 P.2d 1]: "The *Humphrey* court determined evidence of battered women's syndrome was relevant to the defendant's credibility and to show whether she reasonably believed it was necessary to act in self-defense. (*People v. Humphrey, supra*, 13 Cal.4th at p. 1087.) In coming to this conclusion, the court recognized that '[b]attered women's syndrome "has been defined as 'a series of common characteristics that appear in women who are abused physically and psychologically over an *extended period of time* by the dominant male figure in their lives.' " ' [Citations.]" (*People v. Gomez, supra*, 72 Cal.App.4th at p. 416.)[4]

In the context of the reason for admission of the evidence in this case, we disagree with the limitation placed on admission of evidence pursuant to Evidence Code section 1107 in *People v. Gomez.* There is nothing in Evidence Code section 1107 to suggest that the Legislature intended that a batterer get one free episode of domestic violence before admission of evidence to explain why a victim of domestic violence may make inconsistent statements about what occurred and why such a victim may return to the perpetrator. In fact, the result in *Gomez* is at odds with the testimony of the expert in that case, Gail Pincus: "Pincus stated that about 80 percent of the time a woman who has been 'initially assaulted' by a boyfriend, husband or lover will recant, change or minimize her story. This recanting does not happen only after there has been a continuing pattern of abuse. *In fact, depending on the severity of the incident, it is more likely to occur after a first incident.* Pincus stated a woman will tend to minimize and deny the incident. The woman will engage in 'self-blam[e] and 'sort of reconstruct[] th[e] incident, especially if th[e] relationship is going to continue. It's the most common [reaction] of anybody who's been victimized in an intimate relationship.' " (*People v. Gomez, supra*, 72 Cal.App.4th at pp. 411-412, italics added.)

---

[4]Another recent case, *People v. Gadlin* (2000) 78 Cal.App.4th 587 [92 Cal.Rptr.2d 890], discusses the same issue as in *People v. Garcia*, citing and discussing *People v. Garcia* and *People v. Humphrey.* The case concluded that evidence pursuant to Evidence Code section 1107 was properly admitted because there was evidence of prior spousal abuse and therefore admission of the evidence "does no violence to the *Humphrey* definition." (*People v. Gadlin, supra*, at p. 593.)

Additionally, we believe that the concept of having to prove that a victim of domestic abuse has previously been battered, as contemplated within *People v. Humphrey*, is not appropriate in the context of this case. The issue addressed in *People v. Humphrey* was use of evidence of battered women's syndrome to establish self-defense to a charge of homicide. The Supreme Court concluded that the evidence was appropriate to aid the jury "in deciding the reasonableness as well as the existence of defendant's belief that killing was necessary." (*People v. Humphrey, supra*, 13 Cal.4th at p. 1077.) In that light, it is reasonable to require that the alleged victim/defendant establish a history of abuse. That is qualitatively different than the purpose for which the evidence was admitted in this case.

We conclude that the trial court properly admitted the evidence from Ms. Darr.

C.-G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and this matter is remanded to allow the trial court to conduct a hearing on the *Wheeler* issues. First, the court must ascertain whether it can adequately address the issue at this stage. If not, a retrial is required. If the court can address the issue, it must first address the issue of whether a prima facie case can be established. If it determines no prima facie case was established, defendant's conviction is ordered reinstated. If it determines a prima facie case was established, it must then determine whether the prosecutor's reasons for excusing the two jurors are constitutionally valid. If not, and the court grants defendant's *Wheeler* motion, retrial is required. If the trial court determines the prosecutor's reasons for excusing the two jurors are constitutionally valid, and denies defendant's *Wheeler* motion, defendant's conviction is ordered reinstated.

Curry, J., and Dau, J.,† concurred.

A petition for a rehearing was denied March 17, 2000, and appellant's petition for review by the Supreme Court was denied June 14, 2000. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1118.

†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.