Filed 8/23/22 P. v. Villareal CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060236 |
| v. | (Super. Ct. No. 17CF1471) |
| CHRISTOPHER VILLAREAL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge. Affirmed in part, reversed in part and remanded with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

This is another case requiring interpretation and application of changing statutes in cases already tried. While we can find no basis upon which to disparage the performance of the court or counsel below, we must reverse in order to comply with statutory directives legislated after their trial of the matter.

Appellant Christopher Villareal was convicted of attempted premeditated murder and other crimes for facilitating a gang-related shooting. On appeal, he contends his convictions must be reversed due to recent changes in the laws governing criminal street gangs and because the prosecution used improper methods to prove the gang charges. Appellant also seeks the benefit of a new sentencing law. We reverse appellant's gang-related convictions – and the resulting sentence – and remand the matter for further proceedings. In all other respects, we affirm the judgment.

FACTS

The Locotes and the Lopers are rival Santa Ana street gangs. In 2017, appellant, a self-admitted Locotes member, drove his car into an alley in Lopers territory where Loper Brandon Z. was hanging out with his friends. When Brandon saw the car, he took off running, but appellant's front passenger Jesus Casarrubias fired multiple gunshots out his window, hitting him in the wrist and ankle. The police were summoned, and Brandon was taken to the hospital and treated for his wounds.

Appellant fled the scene but was soon spotted driving in Locotes territory with Casarrubias and backseat passenger Rafael Marin. When officers tried to pull them over, appellant refused to yield and led police on a high-speed chase. At one point during the pursuit, appellant stopped to let Casarrubias and Marin out at the apartment of Marin's girlfriend Daisy Aveldanez. Then he sped off again before eventually pulling over and surrendering. Meanwhile, the police surrounded Aveldanez's apartment and captured Marin and Casarrubias. They also took Aveldanez into custody and discovered she was in possession of the gun Casarrubias used to shoot Brandon.

Appellant, Casarrubias and Marin were jointly charged with a variety of crimes. In counts 1 thru 4, the information alleged appellant committed attempted premeditated murder, assault with a semiautomatic firearm, street terrorism, and reckless evasion. (Pen. Code, §§ 664/187, subd. (a); 245, subd. (b); 186.22, subd. (a); Veh. Code, § 2800.2.)[1] The information further alleged as sentence enhancements that appellant committed the crimes in counts 1, 2 and 4 to benefit a criminal street gang (§ 186.22, subd. (b)), and in committing the attempted murder he vicariously discharged a firearm causing great bodily injury to Brandon (§ 12022.53, subds. (d), (e)(1)).

At trial, the prosecution's gang expert Salvador Lopez testified criminal street gangs earn respect by committing violent crimes, which spread fear in the community and signal toughness to their rivals. He also said gang members tend to stick together and only commit crimes with people they trust. And when a gang member has a gun, he is expected to tell everyone in the gang so they know where it is and can use it when needed.

Regarding the Locotes gang, Lopez testified its primary activities at the time of the shooting were unlawfully possessing firearms and armed assault. The gang was also known for committing attempted murder with semiautomatic firearms. Lopez opined appellant and Casarrubias were members of the Locotes gang when the shooting occurred, and Marin was a member of the Bishop Street gang. He said the Locotes and Bishop Street were on neutral terms with each other and shared a common enemy in the Lopers.

In response to a hypothetical question, Lopez said that if two Locotes gang members and a Bishop Street member carried out a drive-by shooting in Lopers territory in a manner similar to how the defendants did in this case, they would be acting in association with each other and benefiting the Locotes gang by striking fear in their rivals

[1] Unless noted otherwise, all further statutory references are to the Penal Code.

and enhancing the gang's reputation for violence. And, they would be promoting, furthering and assisting criminal conduct by Locotes members.

Appellant did not present any evidence in his defense. After the jury convicted him as charged, the trial court sentenced him to 40 years to life in prison.

DISCUSSION

*New Definition of a Criminal Street Gang*

Appellant argues there is insufficient evidence the Locotes constituted a criminal street gang as that term is currently defined under California law. Respondent agrees, and so do we.

To prove the street terrorism charge in count 3, the prosecution had to establish appellant actively participated in a criminal street gang. (§ 186.22, subd. (a).) And to prove the two sentencing enhancement allegations, the prosecution had to establish appellant acted for the benefit of a criminal street gang. (§§ 186.22, subd. (b); 12022.53, subds. (d), (e)(1).) We will refer to these three charges collectively as the gang charges.

At the time of appellant's trial in 2020, a criminal street gang was defined as a group whose members "individually or collectively" have engaged in a pattern of criminal activity involving two or more enumerated offenses. (Former § 186.22, subd. (f).) However, effective January 1, 2022, the Legislature narrowed that definition to require collective engagement in a pattern of criminal activity involving such offenses. (Assembly Bill No. 333 (2021-2022 Reg. Sess.) Stats. 2021, ch. 699, § 3, amending § 186.22, subd. (f).) As respondent concedes, appellant is entitled to the benefit of this change because it redefined the scope of the gang statutes in his favor, and his case is not yet final. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344.)

Respondent also admits the evidence at appellant's trial was insufficient to satisfy this more restrictive definition. While the prosecution presented evidence Locotes members have *individually* engaged in a pattern of criminal activity, there was no

4

evidence of *collective* engagement by the gang. Therefore, we must reverse the jury's guilty verdict and true findings on the gang charges and remand the matter to give the prosecution the opportunity to retry those charges under current law. (*People v. Lopez, supra,* 73 Cal.App.5th at p. 346.)

*New Procedural Requirement in Gang Cases*

Another change in the law that became effective this year relates to how gang cases are tried. Pursuant to newly-enacted section 1109, the trial court must bifurcate gang charges from nongang charges when requested by the defense.[2] Appellant contends this new law mandates reversal of his convictions for attempted premeditated murder and assault with a semiautomatic firearm, but we are not persuaded.

As a preliminary issue, the parties dispute whether section 1109 applies to appellant's case. Unlike the substantive change in the definition of a criminal street gang discussed in the previous section, the change ushered in by section 1109 is purely procedural in that it only effects the order in which gang charges are tried. Because section 1109 does not reduce the punishment for gang activity or narrow the scope of the gang statutes, some courts have ruled it does not apply retroactively. (See, e.g., *People v. Ramirez* (2022) 79 Cal.App.5th 48; *People v. Perez* (2022) 78 Cal.App.5th 192.) However, in that section 1109 establishes a procedural safeguard that provides the possibility of a more favorable trial outcome for a defendant facing gang charges, other courts have found it applies to all cases that are not yet final for purposes of appellate review. (See, e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550; *People v. Ramos* (2022) 77 Cal.App.5th 1116.) We need not weigh in on this issue because any error in failing to bifurcate the gang charges against appellant was surely harmless.

---

[2] Section 1109 states that if requested by the defense in a case in which a gang enhancement is charged under section 186.22, subdivision (b), the "question of the defendant's guilt of the underlying offense shall be first determined[,] and "[i]f the defendant is found guilty of the underlying offense … there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a).) And if the defendant is charged with street terrorism under section 186.22, subdivision (a), "this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (*Id*., subd. (b).)

5

There are two reasons for this. First, the evidence pertaining to the nongang charges was very strong in its own right. The prosecution firmly established that appellant drove his car into an alley with two other people and positioned his vehicle in a manner that allowed his front passenger to fire multiple shots at the victim. And in the wake of the shooting, appellant led police on a dangerous, high-speed chase after they tried to pull him over. This conduct was highly incriminating even without Lopez's expert testimony about appellant's gang membership and how criminal street gangs typically operate.

Second, while section 1109 prescribes the order of evidence in gang cases, it does not preclude the introduction of gang evidence in a bifurcated trial when such evidence is relevant to the nongang charges. (*People v. Ramos, supra*, 77 Cal.App.5th at p. 1132.) In this case, the primary issue on the nongang charges was appellant's intent. In fact, the only issue appellant's attorney bothered to talk about in his closing argument was the premeditation and deliberation allegation attendant to the attempted murder charge. Since there was no direct evidence of what happened or what was said inside appellant's car immediately before the shooting, counsel argued there was insufficient evidence to support that allegation.

However, Lopez's expert testimony was highly relevant to that issue. He testified appellant's gang was known for unlawfully possessing firearms and using them to commit attempted murder. In addition, he explained that although it is dangerous for gang members to venture into rival territory to carry out an attack, they will garner great respect – for both themselves and their gang – if they are able to do so. This testimony undermined the notion the shooting in this case was done on a rash impulse without premeditation and deliberation. Therefore, even in a bifurcated proceeding on the nongang charges it would have been admissible to prove appellant's intent. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [noting gang evidence is often relevant and admissible to prove the defendant's motive and the specific intent required for the

6

charged offense].) Under these circumstances, any error in failing to bifurcate the nongang charges against appellant was harmless under any standard. (*People v. Ramirez, supra,* 79 Cal.App.5th at pp. 70-71 (Conc. opn. of Wilson, J.); *People v. Ramos, supra*, 77 Cal.App.5th at pp. 1131-1133; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

*YouTube Videos*

Appellant asserts the trial court erred in admitting two YouTube videos depicting him and other members of the Locotes gang. He contends the videos should have been excluded because they were insufficiently authenticated and unduly prejudicial. We see no error in their admission.

Before trial, the prosecutor moved to introduce the videos to prove appellant was a Locotes member at the time of the shooting. In response to the court's concerns about possible prejudice and authentication, the prosecutor represented that the videos each consisted of a series of still photographs that gang expert Lopez was prepared to identify and explain at trial. He said one of the videos was two to three minutes long, and the other ran about five minutes.

In response, appellant's attorney said he had no objection to the one video he had seen, and he wanted to reserve any objections to the other one until he had a chance to review it. To mitigate possible prejudice, Marin's attorney suggested just having Lopez explain the videos at trial rather than actually showing them to the jury, but the court did not think that was necessary. Instead, it ruled the videos were admissible subject to any future objection by the defense.

No further objections ensued. At trial, the prosecutor played the videos during Lopez's testimony without any renewed concerns about authenticity or prejudice. Lopez explained he discovered the videos on YouTube while he was investigating Brandon's shooting. One of them was labeled "Locotes Gang," and the other was labeled "Locotes X3." Lopez identified appellant in several of the photos depicted in the videos. In some of the photos, appellant was making Locotes hand signs, and in others, he was

7

posing with Locotes members. Lopez also identified Locotes graffiti and various items associated with the gang, such as a St. Louis Cardinals baseball cap and a green bandana. In addition, there was one photo that showed the letters LCTS – an abbreviation for the Locotes gang – spelled out with bullets.

Arguably, appellant forfeited his right to challenge the videos on appeal by acquiescing to one of them during the pretrial hearing and not objecting to either of them at trial. (*People v. Hinton* (2006) 37 Cal.4th 839, 893, fn. 19; *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.) However, because appellant contends his attorney was ineffective for failing to object more vigorously below, we will consider his claims respecting the videos for the sake of judicial economy. (*People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [addressing forfeited issue "to forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel"].)

On the issue of authentication, the law is clear that a video recording may be authenticated by showing it is a fair and accurate representation of the scene depicted. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.) This foundation need not be provided by the person who took the video or by a person who witnessed the event being recorded. (*Id*. at p. 268.) Instead, "[i]t may be supplied by other witness testimony, circumstantial evidence, content and location. [Citations.]" (*Ibid*.)

Gang expert Lopez described the contents of the subject videos in considerable detail. Not only did he identify appellant and several other Locotes members, he also identified particular locations and specific items depicted in the videos based on his personal experience policing and investigating the Locotes gang. Those identifications were not disputed by the defense, nor did defense counsel question Lopez's interpretation of the videos as far as what they reflected about appellant and his gang.

Granted, there was no testimony as to exactly when the videos were made or who posted them online, but Lopez testified they appeared to reflect events near the

8

date of the shooting. In addition, Lopez noted the videos had the Locotes name in their titles when he found them during his investigation, and his testimony confirmed they related to the Locotes gang. Suffice it to say, there was sufficient evidence of authentication to allow the jury to consider the videos. (See *People v. Goldsmith, supra,* 59 Cal.4th at p. 267 [as long as there is a prima facie showing of authenticity, video evidence is admissible; the possibility that conflicting inferences may be drawn regarding authenticity goes to weight, not admissibility].)

Appellant would have us rule the videos were unduly prejudicial under Evidence Code section 352. But that section only bars evidence that uniquely tends to evoke an emotional bias against defendant. (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) The videos were not likely to do that given the underlying circumstances of the case, which implicated appellant in an unprovoked drive-by shooting, and the other gang evidence presented, which portrayed appellant's gang as a criminal organization that thrived on intimidation and violence. All things considered, the trial court did not abuse its discretion in admitting the videos into evidence.

*Hypothetical Questions*

Next, appellant asserts some of the hypothetical questions the prosecutor posed to gang expert Lopez were improper because he failed to frame them in terms of a hypothetical. Appellant contends this permitted Lopez to offer his opinion about the facts of this case and usurped the duty's duty to determine the truth of the charged offenses. Given how the questioning of Lopez played out, we cannot agree.

In a criminal case, the question of guilt is reserved for the jury, and thus outside the scope of expert testimony. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) However, expert testimony offered in response to a hypothetical question is allowed even if it relates to the ultimate issue to be decided by the jury. (*Ibid.*) Thus, "[w]hile a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to

9

the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.)

Of course, to be probative of the actual charges, the hypothetical question must be grounded in the evidence presented before the jury. (*People v. Vang, supra,* 52 Cal.4th at p. 1045.) Appellant does not dispute that requirement was met here. Rather, his complaint is that the prosecutor's hypothetical questions were so factually specific that they lost their hypothetical quality and became vehicles for gang expert Lopez to give his opinion about the truth of the gang charges. The record shows otherwise.

As a factual predicate for his hypothetical questions, the prosecutor asked Lopez to assume two Locotes members, along with a Bishop Street member, drove into rival territory to shoot a Lopers member and then fled the police in a fruitless attempt to escape apprehension and get rid of the gun. The prosecutor then asked Lopez if such conduct would benefit the Locotes gang, and he said it would by enhancing the gang's reputation for violence.

The prosecutor also asked Lopez if such conduct would promote, further, and assist criminal conduct by members of that gang. Appellant's attorney objected on the basis the prosecutor failed to phrase the question as a hypothetical, and the court sustained the objection. The prosecutor then asked Lopez to answer the question "based on the facts" he received in the "hypothetical." That prompted Marin's attorney to object again, claiming it was improper for the prosecutor to ask Lopez his opinion about something that was both "a hypothetical and a fact."

After the objection was sustained, the prosecutor rephrased his question this way: "Referencing the hypothetical, if the hypothetical were true, then would the conduct of those three individuals from the hypothetical . . . actually promote, further and assist criminal conduct by Locotes criminal street gang members?" This time, defense

10

counsel's objection to the form of the question was overruled, and Lopez answered in the affirmative. He also provided a detailed explanation for his opinion.

Lopez spent the rest of the afternoon answering questions on cross-examination. The next morning, on redirect, the prosecutor asked him, "Going back to the hypothetical from yesterday, do you remember all the long, long list of facts that I read to you in the hypothetical situation?" When Lopez said he did, the prosecutor asked him "how would the driver, specifically in that hypothetical, be benefiting Locotes criminal street gang in his actions?"

Lopez replied, "The driver in the hypothetical would be benefitting the Locotes street gang [by] providing the tool, the driving vehicle, to execute this crime, the shooting against a rival Lopers' gang member." Marin's attorney objected to this response on the grounds it was speculative and constituted an improper opinion, but the court allowed the answer to stand. The prosecutor then asked Lopez if the driver's flight from the police benefited the Locotes gang, which led Marin's attorney to renew his objection. That led to a chambers conference outside the presence of the jury.

During the conference, appellant's attorney complained the prosecutor failed to reference the hypothetical in his last question to Lopez. Counsel said this made it nearly impossible for the jury to "intellectually distinguish between a hypothetical and the facts of this case[.]" "It's a common mistake. I don't think he's doing it on purpose, but it's important that the jury, question by question, be referenced to the hypothetical and not the facts of this case." Although the court agreed with counsel's point, it did not see that being an issue in this case. However, out of an abundance of caution, the court admonished the prosecutor to "make sure the jury knows we're talking only about the hypothetical."

The prosecutor agreed "all the questions should be phrased in terms of the hypothetical." But when he resumed his questioning of Lopez, he did not specifically mention the hypothetical. He simply asked Lopez if he remembered the last question he

11

posed to him. Lopez said he did and proceeded to explain why he believed the driver's actions in fleeing the police benefited the Locotes gang. That prompted the court to chime in with its own questions:

"The Court: And, sir, your response just now has been based on the hypothetical that was given?"

"[Lopez]: Correct, sir.

"The Court: And only the hypothetical?

"[Lopez]: Yes, sir.

"The Court: Okay. Thank you."

The prosecutor then asked Lopez if he remembered the factual predicate for the hypothetical questions he was asked the previous day, specifically "the conduct of the two passengers in the hypothetical," and Lopez said yes. The prosecutor then asked, "And how do[es] the hypothetical passengers' conduct benefit the Locotes criminal street gang in the hypothetical?" Lopez said their conduct benefited the gang "by causing fear, intimidation, being in the vehicle, and also . . . being able to back each other up when they're about to commit a shooting against a rival gang. . . . They're assisting each other during the commission [of the crime described in] the hypothetical."

Following up, the prosecutor asked Lopez if "the hypothetical shooting" also benefited Locotes, and he said that it did by inflicting violence on a rival gang member and letting everybody know the Locotes were not to be trifled with.

Next, the prosecutor asked Lopez if, "in the hypothetical situation," the "three hypothetical people" in the car would be working in association with one another and promoting, furthering and assisting in felonious criminal conduct by others? Again, Lopez answered in the affirmative. He also spoke about how violence by gang members tends to intimidate people and deter them from coming forward and reporting their criminal conduct to the police.

Based on this record, we are hard-pressed to find fault with the prosecutor's hypothetical questions. Appellant contends the questions were phrased in a manner that allowed Lopez to opine about the actual facts of the case, as opposed to the hypothetical facts the prosecutor presented to Lopez. This complaint highlights the mental agility required by such questions. Under our law, they are not relevant unless they accurately relate to the facts of the case, but if they accurately relate to the facts of the case, they come perilously close to an opinion on the defendant's guilt.

We acknowledge this conundrum. But we do not think the line was crossed here. Many of the prosecutor's questions – as well as Lopez's answers – made specific reference to the information described in the hypothetical. It's true that following the chamber's conference on this issue, the prosecutor did not use that phrase in his first question to Lopez. But after Lopez gave his answer, the trial judge wisely and alertly interjected his own questions to make sure the jury understood that Lopez was referring solely to the information provided in the hypothetical.

Under these circumstances, we do not believe the jurors would have construed Lopez's testimony as an opinion about appellant's guilt. Rather, they would have properly understood that Lopez was commenting on the facts laid out in the hypothetical, and his opinions were only relevant to the extent those facts mirrored the evidence presented during the trial. The court's instructions were designed to make this point very clear to the jury, and we conclude the prosecutor's hypothetical questions in this case were not improper.

*Sentencing Issue*

Lastly, appellant contends his sentence must be reversed due to a recent change in section 654. We agree.

Appellant was sentenced to 15 years to life in prison on the attempted murder count, plus 25 years to life under section 12022.53 for vicariously discharging a firearm and causing great bodily injury during that offense. The court imposed

13

concurrent midterm sentences on the assault and street terrorism counts but stayed execution of those terms pursuant to section 654. The court also stayed punishment on the gang enhancements, and on the reckless-evasion count it imposed a two-year concurrent term.

At the time of sentencing, section 654 provided, "An act . . . that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act . . . be punished under more than one provision." (Former § 654, subd. (a).) Thus, upon finding 654 applicable to the attempted murder, assault and street terrorism counts, the court was required to punish appellant for the crime carrying the longest sentence, i.e., the attempted murder, and stay punishment on the other two counts, which it did.

However, effective January 1, 2022, section 654 now provides, "An act . . . that is punishable in different ways by different provisions of law may be punished under either of such provision, but in no case shall the act . . . be punished under more than one provision." (§ 654, subd. (a), as amended by Assembly Bill No. 518 (2020-2021 Reg. Sess.) Stats. 2021, ch. 441.) Therefore, trial courts are no longer required to impose punishment for the crime that carries the longest prison term. This change affords trial courts greater discretion to fashion a sentence that is commensurate with the defendant's culpability.

Respondent concedes appellant is entitled to the benefit of this statutory change, since it could theoretically lessen his punishment. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) However, respondent argues there is no need to disturb appellant's sentence because there is no possibility that he would actually benefit from the change.

In so arguing, respondent relies on the fact the trial court refused to strike appellant's 25-year-to-life firearm enhancement under section 12022.53. However, while

14

it is true the trial court did not believe the interests of justice warranted striking that enhancement altogether, it did not consider whether a reduction of the enhancement was justified. That's probably because the law was unclear as to whether the trial court had such authority at the time it rendered its decision. But since then, our Supreme Court has made it clear that trial courts do have the power to reduce the 25-year-to-life firearm enhancement in section 12022.53 to a lesser included enhancement under that section. (*People v. Tirado* (2022) 12 Cal.5th 688.) Since the trial court was never called on to consider such a reduction in this case, we cannot read too much into its decision not to strike the enhancement in its entirety.

In urging us to affirm appellant's sentence, respondent also points out the trial court cited several factors in aggravation in support of its sentencing decision, including the victim's vulnerability and the high degree of cruelty and dangerousness associated with appellant's actions. However, due to a recent change in the law to which appellant is entitled, the trial court cannot rely on such aggravating factors to increase a sentence unless they have been stipulated to by the defendant or proven true beyond a reasonable doubt, neither of which occurred here. (See § 1170, subds. (b)(1), (2); *People v. Lopez* (2022) 78 Cal.App.5th 459; *People v. Garcia* (2022) 76 Cal.App.5th 887.) And although it is readily apparent appellant engaged in wanton conduct, we cannot be sure a trier of fact would have been convinced beyond a reasonable doubt that all of the aggravating factors the trial court relied on actually applied in this case.

In fine, it is simply not clear to us that appellant, who was only 20 years old at the time of his crimes, would have received the same sentence if the trial court had applied the current version of section 654 and all the other sentencing rules that have become effective since the time he was sentenced. Therefore, we will reverse his sentence and order a new sentencing hearing. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [in appeals involving new sentencing rules, the proper disposition is to reverse and remand unless the record clearly shows the defendant would not have

15

benefited from application of those rules]; *People v. Jones* (2019) 32 Cal.App.5th 267, 272-273 [same].)

## DISPOSITION

Appellant's conviction for street terrorism in count 3 is reversed, as are the jury's true findings on the sentence enhancement allegations. On remand, the prosecution shall have the option to retry appellant on those charges. Irrespective of whether the prosecution exercises that option, appellant's sentence is reversed, and the trial court shall resentence appellant under the current sentencing rules. In all other respects, the judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


GOETHALS, J.


16