Filed 5/11/15  P. v. Wilson CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN P. WILSON,<br><br>    Defendant and Appellant. | B250049<br><br>(Los Angeles County<br>Super. Ct. No. MA050711) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Todd L. Melnik, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephen D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant Stephen P. Wilson was convicted of attempted murder, torture, assault by means likely to produce great bodily injury, false imprisonment, willful infliction of corporal injury on a cohabitant, and criminal threats. The jury did not reach a verdict as to a seventh count, forcible rape. Wilson asserts numerous claims of error stemming from his trial, including: (1) the trial court abused its discretion in denying his request for a continuance; (2) the trial court abused its discretion in admitting a telephone statement made by Wilson, in which he told his friend that his former attorney told him he had "no defense"; (3) the trial court abused its discretion when it admitted evidence of past, uncharged incidents of domestic violence under Evidence Code section 1109; (4) the trial court abused its discretion in admitting expert testimony concerning intimate partner violence, commonly known as battered woman syndrome; (5) the prosecutor engaged in misconduct during closing argument; and (6) the trial court erred in providing the jury with a "firecracker" instruction after the jury indicated it could not reach a verdict as to some or all of the charges against Wilson. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**The Prosecution's Case-in-Chief**

*1. Wilson and the Victim's Relationship*

Wilson and the victim (Alice) met in June 2002, and they began dating a month later. Although Wilson was married at the time, he told Alice that he was in the process of divorcing his wife.

By 2006, Wilson had yet to divorce his wife, and in March of that year, Alice broke up with him. She told him not to contact her anymore, and she moved to Las Vegas, Nevada with her son. She never gave Wilson her Las Vegas contact information.

About a week after Alice moved to Las Vegas, Wilson arrived unannounced at her apartment. They briefly spoke and Wilson left. Two days later, Alice broke the lease on her Las Vegas apartment and moved to another apartment in Henderson, Nevada. She also opened a post office (P.O.) box in Henderson, where she directed all of her mail. Again, she did not give Wilson her new contact information.

2

A couple of months after Alice moved to Henderson, Wilson approached her at the P.O. box. He acted surprised to see Alice and asked her to go to dinner. Although Alice was upset, she agreed to have dinner with Wilson.

Soon after Wilson approached her in Henderson, Alice broke her apartment's lease and moved to another apartment in Henderson. This time, Alice registered the apartment's utilities in her son's name. She also opened a new P.O. box.

About six months after Alice moved into her second apartment in Henderson, Wilson bought Alice a luxury car, which he had delivered to her mother's house in Lancaster, California. At first, Alice rejected the car and told her mother to keep it; however, she later accepted the car, and her mother drove it to her apartment in Henderson. Alice insured the car using the address for her second apartment in Henderson. After finding Alice's address through the car's insurance information, Wilson again approached Alice unannounced in Henderson. She later moved to another apartment.

In 2007, Wilson told Alice that he still intended to divorce his wife, and he convinced her to restart their relationship. They began seeing each other again, alternating weekends between California and Nevada.

2. *Prior Incidents of Violence*

In September 2008, Wilson and Alice's relationship became violent after Wilson accused Alice of seeing someone else. During one incident, Wilson grabbed Alice's hair and threw her to the floor. He jumped on her, pinned her down with his knees, and began punching her face, pulling her hair, and shaking her head. Throughout the next two days, Wilson did not let Alice leave his house, and he continued to attack her, at one point choking her until she fell unconscious.

On the third day, while Wilson was in the shower, Alice grabbed her belongings and some money from Wilson's wallet and ran outside the house. She hid in some bushes in Wilson's neighborhood for about an hour while Wilson drove around looking for her. Eventually, Alice was approached by a jogger, who helped her get to the airport. Alice did not report Wilson to the police because she did not want him to get in trouble.

3

Shortly after Alice returned to Nevada, Wilson showed up at her house. They talked for about an hour and then went to Wilson's hotel room, where he apologized. Alice agreed to return to Los Angeles with Wilson, where she consulted a doctor about her injuries sustained during Wilson's earlier attacks. She was diagnosed with a ruptured spleen.

In October 2008, Wilson attacked Alice again. After they had sex, Wilson began accusing Alice of sleeping with other men. He threw her clothes on the floor and told her to leave his house. As Alice was gathering her clothes, Wilson threw her to the bed, pinned her down, and began hitting her. After Alice kicked Wilson off of her, she grabbed Wilson's cell phone, ran into the bathroom, and called 9-1-1. Wilson was taken into custody, but he was released a few hours later.

In December 2008, Wilson attacked Alice again. While they were lying in bed, Wilson grabbed Alice by her hair, dragged her outside, and threw her into the deep end of his pool. Alice tried to scream, but Wilson held her head underwater until she passed out. Alice woke up in Wilson's shower. Sheriff's deputies arrived later and arrested Wilson, but he was released from custody a few hours later.

In June 2009, Wilson attacked Alice a fourth time. After Alice refused to have sex with him, Wilson grabbed her hair, pressed his arm against her throat, and began accusing her of spreading rumors about his wife. He then slammed Alice's face against the bottom of an upturned chair. She kicked him, ran outside onto a balcony, and screamed for help, but he dragged her back into the house and started hitting her again.

After Wilson stopped hitting her, Alice ran outside the house, got into her car, and drove to a sheriff's station. Wilson was arrested and later released from custody. Charges were filed against him.

Alice continued seeing Wilson, and they moved into a new house in Palmdale. When Wilson was later taken into custody, Alice agreed to look after his house and real estate business. After Wilson was in custody for several months, he began accusing Alice of having affairs with his attorney, the female judge presiding over his criminal

4

case, and his friends and business associates. Alice then stopped contacting Wilson and moved into her mother's house in Lancaster.

On September 1, 2010, Alice received notice that Wilson was being released from custody. The next day, they met at a dog park and went to a motel. After having sex at the motel, Wilson pinned Alice to the bed and began accusing her of sleeping with other people. Alice screamed and ran to her car, but Wilson followed. They drove back to the dog park, and Wilson asked Alice if she was going to tell the police he had beat and raped her. Alice did not talk to Wilson again for over a month.

*3. The Underlying Incident*

On October 14, 2010, Alice went to Wilson's house, where she stayed for the night. The next day, Wilson accused her of stealing food from the house and supplying beer and cigarettes to his daughter while he was in custody. Alice tried to leave the house, but Wilson grabbed her hair, placed her in a choke hold, and dragged her to his bedroom.

Wilson threw Alice onto his bed, pinned her down, and accused her of having sex with other people in his house. He then grabbed a belt and looped it around her neck. Before he could tighten the belt, Alice placed her arm between the belt and her neck and pulled the belt out of Wilson's hands. She then hit Wilson in the chin and tried to push him away, but he threw her to the floor and pinned her down, saying "you think you're fucking getting out of here? You're not going anywhere. You're gonna die here, you fucking bitch. . . . You're gonna fucking die. It's time for you to meet your maker; the devil. It was nice knowing you."

Wilson punched Alice's face about 20 times and slid his knee underneath her chin. Alice began inhaling blood, preventing her from breathing. Wilson forced all of his weight onto Alice's body until she passed out.

When Alice woke up, Wilson was stomping her ribs and telling her to wake up. Wilson then asked Alice to whom she was giving all of his money. When Alice did not respond, Wilson kicked her chest. He then told her that he was missing $3 million and

accused her of giving the money to her friends. When she denied doing so, Wilson said, "Wrong answer," and kicked her again.

Wilson continued to ask Alice questions, and after each question she was unable to reply to, he would stomp on her and say, "wrong answer." Wilson did this approximately 15 times. Wilson then pinned Alice down, applying all of his weight with his knees. He continued to ask Alice questions, and each time she could not provide a satisfactory response, he punched her face. He did this approximately 30 times. According to Alice, Wilson continued questioning and beating her for about two hours until she passed out again.

When Alice woke up, Wilson told her that she had "some seizures or something" while she was passed out. Alice asked Wilson to call an ambulance. He told her he would call in 20 minutes after he cleaned the house.

Several minutes later, Wilson tore off Alice's shirt, removed her breasts from her bra, and said, "I didn't pay for these for someone else to be using; did I?" He then began grabbing, scratching, and biting at Alice's breasts, as if he were trying to tear off her skin. Alice screamed and hit Wilson. Wilson then said, "Calm down, calm down, let's just take a 15-minute break from all this . . . I need to have sex with you." Wilson then carried Alice, whose eyes were swollen shut and mouth was filled with blood, to his bed, where he had sex with her.

When Wilson rolled off of her body, Alice grabbed his phone and crawled under the bed. She tried to call for help, but Wilson grabbed her, dragged her out from under the bed, and tried to choke her with his phone's power chord. Alice was able to place her arm between the chord and her neck, breaking the chord when Wilson tried to choke her. Wilson then kicked Alice's back and thighs and began punching her face. He then choked her and placed his hands over her nose and mouth, suffocating her until she passed out.

When Alice woke up, she heard Wilson downstairs. She crawled to the front door and tried to leave the house, but Wilson grabbed her from behind and placed her in a

6

choke hold.  He then dragged her back into the house and called his brother-in-law Ty Godde to ask for help taking care of a "problem" he was having.

Alice again asked Wilson to call an ambulance.  He told her that he would after he cleaned up the house.  When Wilson left the room, Alice ran out the front door and fell on the lawn.  She heard male voices in the neighborhood and began waving her arms. When she heard the voices approaching, Wilson grabbed her and took her back into the house.  He placed Alice on a chair and called 9-1-1.

*4.  Wilson's Arrest*

Los Angeles Sheriff's Deputy David Chavez responded to Wilson's 9-1-1 call.  He found Wilson standing outside the house with his hands covered in blood.  Wilson said, "She's inside the house and she's beat up pretty bad."  Deputy Chavez placed Wilson under arrest and later spoke to him in a patrol car.[1]

Wilson told Deputy Chavez that he and Alice had gotten into a fight because he believed she had been taking money from him throughout their eight-year relationship. He said that he "just lost it" and began fighting with Alice.  When asked to explain, Wilson said, "Look at her.  What do you think?"  He then told Deputy Chavez that he had become so enraged over the thought that Alice had stolen money from him, that he wanted to kill her.  When asked how he intended to kill Alice, Wilson responded, "Look at her.  How do you think?"  According to Deputy Chavez, Wilson appeared calm during the conversation in the patrol car.

*5.  Alice's Injuries*

Alice was hospitalized for four days.  She suffered seven broken ribs, two broken eye sockets, a broken nose, and a broken cheekbone.  She also suffered numerous abrasions and contusions over her entire body, and she had bite and scratch marks near her breasts.  At the hospital, Alice had difficulty recounting the incident with Deputy

---

[1]     Deputy Chavez read Wilson his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, which Wilson acknowledged he understood and waived.

7

Chavez due to her injuries, and she purposely minimized some of the details of the incident because her family was present. At the time, she did not accuse Wilson of raping her during the incident.

In December 2010, Alice drafted a lengthy written statement recounting her relationship with Wilson. In the statement, she reported that Wilson had sex with her during the period of the attack, but she did not explicitly state that he had sexually assaulted or raped her.

*6. Recorded Jail Calls[2]*

In December 2010, Wilson called his wife from jail. He complained about how his attorney had yet to have him evaluated by a doctor. He said: "[I]t's just a waste of money to send a . . . doctor down there. The doctor is not going to say I'm crazy or anything, or . . . I was insane because I wasn't insane. I was just . . . you know what my thought was[?] I was going alright, this [] bitch is going to [] send me to [] jail for [] life because I knew . . . that's what she was trying to do and I was like okay I'm going to [] send me to jail for [] life and that's what it's going to cost you."

That same day, Wilson called his friend. He complained about Alice's behavior and his former attorney's handling of his case. He thought Alice had planned to have him sent back to jail after he was released in October 2010 knowing that he would assault her when they met on the night of October 14. He said: "[T]his bitch is trying to [] get me sent back to [] jail for life and [] destitute my family and all this other shit. So I'm like, well, hey, if I've got to go to jail for life and my family is going to be destitute, there's got to be some – we better even the playing field here somewhat. I don't think that was a good calculation." When asked whether he blacked out while he was attacking Alice on October 14, Wilson responded, "So then this last one . . . I was fully [] cognizant of what . . . was going on, I think, it was just a matter of whether I was [] rationally sane

---

[2]     Wilson made several calls from jail that were recorded and later played for the jury.

8

or not, who . . . knows." At the end of the call, Wilson said that his former attorney had told him he had "no defense."

In January 2011, Wilson called his wife. He told her he was the "victim," and he said, "you should have given me a, you know, what I wanted. I could have been done with her [Alice]." He then said, "I'd have a manslaughter charge. I'd have been a lot better off. . . . I'd have been better off with a manslaughter [] charge. That's what I would have had if I'd had . . . shot her, I'd have been there for manslaughter."

*7. Domestic Violence Expert Testimony*

At trial, the prosecution called Dr. Sandra Baca, the Clinical Director of the About Face Domestic Violence Intervention Project in Los Angeles. She testified about battered woman syndrome. Dr. Baca described the typical characteristics of an intimate relationship involving battered woman syndrome, including the three defining phases, which constitute the cycle of violence. The first phase, known as the tension phase, involves a period of growing tension between the abused and the abuser. The second phase, known as the battering phase, involves the actual abuse. During the third phase, known as the honeymoon phase, the abuser acts kind towards the abused, causing the abused to believe the abuser is the person that the abused fell in love with, which in turn causes the abused to feel safe and comfortable around the abuser. She also described what is commonly referred to as the power-and-control wheel, which represents the various forms of abuse (including economic, physical, and emotional) that an abusive partner will employ in a relationship involving battered woman syndrome.

Dr. Baca explained why a woman who is frequently abused by her partner may stay in the abusive relationship and not report the ongoing violence to authorities or family members. She also described the various behavioral patterns an abused partner may pursue in hope of reducing violence in the relationship.

9

**Wilson's Evidence[3]**

Five experts testified on Wilson's behalf: three mental health experts, a criminalist, and a forensic pathologist. Wilson's brother-in-law Ty Godde also testified. Wilson presented the mental health testimony to establish that he was suffering from bipolar disorder at the time he attacked Alice in October 2010. At trial, Wilson did not dispute that he attacked Alice; rather, he argued that, due to his suffering from bipolar disorder, he did not attack her with premeditation and deliberation.

Wilson presented the forensic pathologist's testimony to establish that he did not strangle Alice during the attack. He presented the criminalist's testimony to establish that semen found on the pair of jeans Alice was wearing the night of the attack was not his.

*1. Mental Health Experts*

Dr. Romeo Isidro testified as Wilson's treating psychiatrist. In June 2009, Wilson was referred to Dr. Isidro for a psychiatric evaluation. Wilson complained that he had been experiencing mood swings that were often accentuated by episodes of agitation and anger. After interviewing and examining Wilson, and reviewing his medical history, Dr. Isidro diagnosed Wilson with bipolar disorder. He prescribed Abilify, a mood stabilizer. Although Wilson displayed many indicators of antisocial personality disorder, Dr. Isidro ruled out such a diagnosis because Wilson did not report exhibiting behavioral patterns as a teenager that are indicative of antisocial personality disorder.[4]

Dr. Ari Kalechstein, a psychologist specializing in neuro- and forensic psychology, also testified on Wilson's behalf. Prior to trial, he interviewed Wilson and reviewed various documents, including records pertaining to Wilson's mental-health treatment history and a report written by Alice after the October 2010 attack, in which she described Wilson's behavior during the attack. In Dr. Kalechstein's opinion, Wilson suffered from bipolar disorder. Although he believed that Wilson also exhibited various

---

[3]    Wilson did not testify.

[4]    According to Dr. Isidro, it is unlikely a person has antisocial personality disorder unless that person exhibits certain indicators by the age of 15.

indicators of antisocial personality disorder, he did not believe that Wilson suffered from that disorder. After reading Alice's report, Dr. Kalechstein formed the opinion that Wilson was experiencing a manic episode at the time of the attack. According to Dr. Kalechstein, a person with bipolar disorder experiencing a manic episode may become aggressive and violent and engage in reckless behavior for no apparent reason.

Dr. James Rosenberg, a psychiatrist, also testified on Wilson's behalf. Like Drs. Isidro and Kalechstein, Dr. Rosenberg opined that Wilson suffered from bipolar disorder, and not antisocial personality disorder. He testified about the primary differences between bipolar disorder and antisocial personality disorder. Bipolar disorder is a mental disorder that typically manifests later in life. Antisocial personality disorder, on the other hand, is a psychiatric disorder that manifests early in life, through pervasive patterns, and is part of an individual's fixed background. A person suffering from bipolar disorder is likely to make rash, split-second decisions and may quickly alternate between periods of calm and anger or violence. In Dr. Rosenberg's opinion, Wilson was experiencing a manic episode when he attacked Alice in October 2010.

*2. Forensic Experts*

Christina Gonzalez, a senior criminalist with the Los Angeles Sheriff's Department, testified on Wilson's behalf. She tested a sample of DNA obtained from the pair of jeans Alice was wearing the night of the attack, which contained two donors, a male and a female. Gonzalez tested the sample from Alice's jeans against a reference sample of Wilson's DNA. Wilson was excluded as a contributor to the DNA sample from Alice's jeans.

Dr. Silvia Poparini, a forensic pathologist, testified about the injuries Alice suffered during Wilson's attack. She based her testimony on her review of photographs of Alice's injuries taken shortly after the attack and Alice's medical records. According to Dr. Poparini, the injuries to Alice's neck were not consistent with strangulation. Rather, they were consistent with blunt force trauma. Dr. Poparini did not observe finger-pressure marks on Alice's neck or petechiae (red spots caused by broken blood

11

vessels under the skin) on her face, both of which are indicators of strangulation. According to Dr. Poparini, Alice's injuries were not life-threatening.

### 3. Other Evidence

Ty Godde, Wilson's brother-in-law, testified that he had dinner with Wilson a few days before the attack. According to Godde, Wilson was not acting like his usual self during dinner. Wilson was paranoid and paced around a lot, and he obsessively complained about other people stealing his money.

**The Prosecution's Rebuttal Evidence**

Mary Reina, a registered nurse and the director of Antelope Valley Hospital's forensic unit, testified as the prosecution's rebuttal witness. In her opinion, the photographs of Alice's injuries taken shortly after the attack indicated that Alice had been strangled. She observed abrasions and bruises on Alice's neck and petechiae on her face, both of which were consistent with strangulation. She also opined that Alice's loss of bowel and bladder function, difficulty speaking, vomiting blood, and experiencing throat pain shortly after the attack indicated that Alice had been strangled.

**Procedural Background**

Wilson was charged with seven crimes: *count 1*: attempted willful, deliberate, and premeditated murder (Pen. Code,[5] §§ 664/187, subd. (a)); *count 2*: torture (§ 206); *count 3*: assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)); *count 4*: false imprisonment (§ 236); *count 5*: willful infliction of corporal injury on a cohabitant (§ 273.5, subd. (a)); *count 6*: criminal threats (§ 422); and *count 7*: forcible rape (§ 261, subd. (a)). As to counts 1, 3, and 5, it was alleged that Wilson personally inflicted great bodily injury upon Alice within the meaning of section 12022.7, subdivision (e).

The jury found Wilson guilty of counts 1 through 6, and it found true the great-bodily-injury allegation as to counts 1, 3, and 5. The jury did not find that Wilson

---

[5] All further statutory references to the Penal Code unless otherwise specified.

committed the attempted murder willfully, deliberately, and with premeditation. It could not reach a verdict as to count 7, forcible rape, and the trial court declared a mistrial as to that charge.

The court sentenced Wilson to a total term of life plus 14 years and 8 months. Wilson filed a timely notice of appeal.

## DISCUSSION

### I. Denial of Wilson's Request for a Continuance

*A. Relevant Proceedings*

Wilson was arraigned on the information on March 22, 2011. The case was initially set for trial on April 14, 2011. After three defense-requested continuances and several stipulated continuances, Wilson's trial was ultimately set for April 2, 2013.

On April 2, 2013, Wilson filed a fourth request for continuance. The request was based on a March 27, 2013 notice the prosecutor provided to Wilson's attorneys disclosing that she had received taped conversations between Wilson and one of his attorneys recorded while he was in custody. In her disclosure, the prosecutor stated that she stopped listening to the recording immediately after she determined that it contained a conversation between Wilson and one of his attorneys. According to Wilson's request for continuance, the disk containing the above-referenced conversation also contained recordings of conversations between Wilson and one of his other attorneys. Wilson asserted that the prosecutor did not explain how, why, or when she came into possession of the conversations. Wilson requested additional time to investigate who was responsible for the alleged breach of the attorney-client privilege.

At the hearing on Wilson's request before the master calendar, Wilson asserted a second ground for continuance. During the weekend before April 2, 2013, Wilson's attorneys received a memorandum from the prosecutor disclosing that in 2000, Alice had had an intimate relationship with the Los Angeles County Sheriff's deputy to whom she first reported that Wilson had raped her on October 15, 2010. Although Wilson's attorneys had suspected that Alice and the deputy had been in an intimate relationship in the past, the District Attorney's Office had not confirmed the relationship until the

13

prosecutor sent the memorandum shortly before the hearing. The prosecutor told the court that she did not receive confirmation about the relationship until a day or two before she sent Wilson's attorneys the memorandum.

Wilson's attorney argued that a continuance was necessary to investigate and interview the deputy. He intended to call the deputy as a witness because his testimony could reflect on the veracity of Alice's testimony. The prosecutor argued a continuance was unnecessary because she did not intend to call the deputy as a witness during her case-in-chief.

The court denied Wilson's request. It observed Wilson's attorneys had been aware of the potential relationship between Alice and the deputy before receiving the prosecutor's memorandum. The court reasoned Wilson's attorneys had sufficient opportunity to investigate the relationship before announcing ready for trial, and that they could continue to investigate the relationship before presenting Wilson's defense. The court also found that the prosecutor had adequately disclosed information about the relationship.

That same day, Wilson renewed his continuance request after his case was assigned for trial. He argued that changed circumstances warranting reconsideration of the court's prior ruling existed based on the prosecution's recent addition of Dr. Baca's name to its witness list. He argued the prosecution's decision to call Dr. Baca as a witness was untimely because the prosecutor did not provide notice that Dr. Baca would be called until a week before he made the continuance request.

Wilson elaborated on his request as it related to the prosecutor's disclosure of Alice's relationship with the Sheriff's deputy. According to Wilson, the deputy was involved with the prosecution's initial filing of charges against him, which did not include the rape allegation. However, after the complaint was filed, the deputy contacted Alice, and she, for the first time in speaking to law enforcement personnel, told him that Wilson had also raped her during the attack on October 15, 2010. Wilson claimed that the District Attorney's Office had failed to respond to informal and written discovery requests concerning the deputy's relationship with Alice.

14

Wilson claimed that the deputy was biased against him based on the deputy's prior relationship with Alice, and he argued that he needed additional time to investigate the deputy and Alice's relationship. Again, the prosecutor informed the court that she did not intend to call the deputy as a witness. The court stated that disclosure of the relationship did not constitute good cause to grant a continuance because the relationship occurred more than 10 years prior to the incident underlying Wilson's charges and the prosecution did not intend to call the deputy as a corroborating witness for Alice's testimony concerning the rape allegation.

Wilson also argued that he was entitled to a continuance based on the prosecutor's disclosure that she had received recordings of conversations between Wilson and his attorneys. Wilson requested a continuance to hire a forensic analyst to determine whether anyone at the District Attorney's Office had listened to the content of the conversations. The prosecutor again informed the court that she had not listened to the content of any of the conversations. The court stated that it believed the prosecutor and denied Wilson's request.

On April 3 and 4, the parties selected a jury, and on April 5, the prosecution began presenting its case-in-chief. On April 10, the prosecution rested. Wilson called his first witness on April 11.

*B. Standard of Review*

A request for continuance in a criminal proceeding may only be granted for good cause, and a trial court's denial of such a request is reviewed for abuse of discretion. (§ 1050; *People v. D'Arcy* (2010) 48 Cal.4th 257, 287 (*D'Arcy*); *People v. Beames* (2007) 40 Cal.4th 907, 920 ["The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked."].) In addition to establishing an abuse of discretion, the party challenging the ruling must also demonstrate that it was prejudiced by the trial court's denial of the request for continuance. (*People v. Samayoa* (1997) 15 Cal.4th 795, 840.) The trial court's discretion is not boundless, however; it may not be exercised in a

manner that would deprive the defendant of a reasonable opportunity to prepare a defense. (*People v. Riggs* (2008) 44 Cal.4th 248, 296 (*Riggs*).)

"'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' [Citation.]" (*D'Arcy*, *supra*, 40 Cal.4th at pp. 287-288.) Aside from the proffered reasons for the continuance, the court may consider other factors, including: (1) the benefit the moving party anticipates will result from the continuance; (2) the likelihood such benefit will result; (3) the burden of continuing the proceedings on the witnesses, the jurors, and the court; and (4) whether substantial justice will be accomplished or defeated by granting the continuance. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.)

### C. *The Trial Court Did Not Abuse Its Discretion in Denying Wilson's Request for Continuance*

Wilson contends the trial court abused its discretion in denying his request for continuance because it precluded his counsel from effectively preparing for trial. We disagree.

An important factor a trial court may consider in determining whether to grant a continuance is whether the continuance would be useful. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 (*Beeler*).) Additionally, the court may consider the likelihood that the moving party will benefit from a continuance. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1037.) The party requesting the continuance bears the burden of establishing usefulness, and it must show that the sought-after evidence is material. (*Beeler*, *supra*, 9 Cal.4th at p. 1003.)

Wilson argues a continuance was necessary to investigate the deputy to whom Alice first reported Wilson's alleged rape and with whom she had a dating relationship 10 years before the October 2010 attack. He argues once the deputy and Alice's relationship was revealed shortly before trial, the deputy became a focal point of his defense because

the deputy could have been key to attacking Alice's credibility. Wilson has failed to demonstrate there was good cause to grant a continuance.

To establish good cause for a continuance, a defendant bears the burden of showing that he exercised due diligence to secure the sought-after evidence and that the facts the evidence would establish could not otherwise be proven. (*People v. Roybal* (1998) 19 Cal.4th 481, 504.) Wilson did not exercise due diligence in investigating the deputy and Alice's relationship. As the trial court noted during the hearing on Wilson's continuance request, Wilson was aware that Alice may have had a relationship with the deputy several months before that fact was confirmed by the prosecution. Although Wilson requested written discovery from the prosecution addressing the issue several months before trial, the prosecution did not receive confirmation about the relationship until shortly before it notified Wilson about the relationship. Wilson did not explain why he did not independently investigate the relationship, despite the fact that he was aware of its possible existence, any time before trial.

Additionally, Wilson has not demonstrated that he exercised due diligence in procuring the deputy's or Alice's testimony on issues relevant to Alice's credibility. Wilson argues the deputy's testimony would have been material to demonstrate any potential bias the deputy may have had against Wilson and to reveal whether the deputy had coached Alice in preparing her statements to law enforcement and her testimony at trial. Wilson had more than a week between the time he requested a continuance and the time he presented his defense at trial within which he could have investigated the relationship and decided to call the deputy if he believed his testimony would have been material to Alice's credibility. He did not call the deputy as a witness and he did not demonstrate that he was unable to do so. Further, Wilson could have questioned Alice about the nature of her relationship with the deputy and to what extent they had contacted each other following the October 2010 attack. Again, he did not do so. Accordingly, the trial court did not abuse its discretion in denying Wilson's request for a continuance to investigate the deputy and his past relationship with Alice.

Next, Wilson argues a continuance was warranted to allow him to investigate Dr. Baca after she was added to the prosecution's witness list. Wilson has not shown how the investigation would have been material to his defense or that he was prejudiced by the court's denial of his request. As the trial court observed, the prosecution informed Wilson in September 2012, more than six months before trial, that it intended to call an expert witness to testify about the general characteristics of battered woman syndrome. Although the prosecution decided near the eve of trial to call a different witness than the one identified in September 2012, the prosecutor informed the court that the substance of Dr. Baca's testimony would be no different than the substance of the original expert's testimony.

It was not an abuse of discretion for the trial court to deny Wilson's request for continuance to investigate Dr. Baca because Wilson had been aware of the content about which she intended to testify for more than six months before trial and he failed to demonstrate that extended investigation into her background would have been material to his defense. Similarly, on appeal, Wilson has set forth no argument explaining how he was prejudiced by his inability to investigate Dr. Baca prior to trial. Rather, he sets forth generalized arguments asserting that his counsel was deprived of its ability to file "appropriate motions" and "investigate the newly disclosed material," without explaining what motions would have aided his defense or what effect evidence obtained from his investigation of Dr. Baca would have had on his defense.

Wilson finally argues a continuance was warranted to allow him to investigate whether the prosecution listened to the recordings of telephone conversations between himself and his trial attorneys. He contends he needed additional time to hire a forensic analyst to investigate whether the prosecution had in fact listened to the recorded conversations and, if so, to seek the District Attorney Office's recusal from his case.

The trial court did not abuse its discretion in denying Wilson's request. The prosecutor informed the court that on both occasions when she realized she was in possession of telephone calls between Wilson and his attorneys, she immediately stopped listening to the recordings after she heard Wilson and his counsel identify themselves. In

the first instance, she was in the presence of a witness, whom she was prepared to call to testify before trial to verify that she did not listen to the content of the recordings, and she immediately brought the issue to the attention of Wilson's attorneys and the court.  In the second instance, she discovered that she was again in possession of privileged recordings while she was at home.  Although she did not have a witness prepared to verify that she did not listen to the substance of the conversations, she again brought the issue to the attention of Wilson's attorneys and the court as soon as possible.  Based on the manner in which she ensured that no breach of the attorney-client privilege occurred with respect to the first set of recordings, it was not unreasonable for the trial court to trust that the prosecutor did not listen to the substance of the second set of recordings.

In light of the foregoing, we conclude the trial court did not abuse its discretion in denying Wilson's requests for continuance.

## II.    Admission of Wilson's Statement About His Attorney's Opinion

Wilson contends the trial court abused its discretion in admitting the telephone statement he made to his friend about his former attorney's opinion that he had no defense to the charges against him.  Appellant contends the statement was inadmissible because his attorney's opinion about the strength of his case was irrelevant and unduly prejudicial.

### A.  Relevant Proceedings

Before his jail calls were played to the jury, Wilson sought to exclude the portion of the December 1, 2010 call to his friend in which he states that his prior attorney, who did not represent him at trial, told him he had "no defense."   That statement was made in the following context:

> "[Friend:]    Did you get –  has the psychiatrist come to see you yet?
> "[Wilson:]    Uh-uh.
> "[Friend:]    No?
> "[Wilson:]    They're not gonna –
> "[Friend:]    Well, I guess Eberhardt [Wilson's former attorney] is –

19

"[Wilson:]     They're not going to – they're not going to say I'm – they're not going to say I'm crazy.

"[Friend:]     Well, I think maybe just, uh, that you've kind of lost your mind for the moment, you know? Like you had a momentary, uh a –

"[Wilson:]     Temporary insanity?

"[Friend:]     Yeah. Like, crime of passion or something, I don't know.

"[Wilson:]     Crime of passion? . . . [¶] That's a good idea.

"[Friend:]     I don't know what he's got up his sleeve, but, you know--

"[Wilson:]     You know what he told me? . . . [¶] Do you know what he told me?

"[Friend:]     What?

"[Wilson:]     He said there's no defense.

"[Friend:]     Well, didn't you call 911 on yourself?

"[Wilson:]     Woo hoo. Big deal. That's only because I got tired of listening to her fucking going on and on about calling 911. . . . [¶] I got tired of listening to her."

Wilson argued that the statement that his former attorney had told him he had no defense should have been excluded because his former attorney's opinion about the strength of his case was irrelevant. The court disagreed. It found the entire conversation, including Wilson's statement about his attorney's opinion, was relevant, because it corroborated Alice's description of the attack and shed light on Wilson's mental state following the attack. The court ruled: "I'm not going to order that redacted. I think it is highly relevant and probative. . . . [¶] I don't think that there is any prejudice contemplated by the case law in terms of Evidence Code section 352; clearly nothing that would outweigh the highly probative value, so I'm going to leave that in."

*B. Standard of Review and Applicable Law*

Only relevant evidence is admissible. (Evid. Code, § 350; *People v. Babbitt* (1988) 45 Cal.3d 660, 681.) "Relevant evidence" is "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in

20

reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"""""The trial court has broad discretion in determining the relevance of evidence . . . but lacks discretion to admit irrelevant evidence. [Citations.]"""" [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.) The court also has broad discretion to exclude relevant evidence if such evidence's "probative value is substantially outweighed by the probability its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, confusing the issues, or of misleading the jury." (*People v. Mills* (2010) 48 Cal.4th 158, 195; see also Evid. Code, § 210.) Undue prejudice results when the evidence "tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Robinson* (2005) 37 Cal.4th 592, 632.) A trial court's ruling concerning relevancy and undue prejudice will not be disturbed on appeal "unless it is shown the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Merriman* (2014) 60 Cal.4th 1, 76.)

### C. *The Trial Court's Admission of Wilson's Statement Was Harmless*

Wilson contends the trial court abused its discretion in admitting his statement that his former attorney had told him he had no defense. He argues the statement was irrelevant and should have been excluded. We agree that the statement should have been excluded but conclude that its admission was harmless.

Wilson's comment to his friend about his former attorney's opinion expressed less than two months after he committed the underlying crimes was hearsay, and any probative value it may have had was significantly outweighed by its potential prejudicial impact. Accordingly, the trial court should have excluded that portion of Wilson's jail call under Evidence Code section 352 and as hearsay. However, the trial court's erroneous admission of the statement was harmless.

First, there was overwhelming evidence that Wilson attacked Alice, and he did not dispute that issue at trial. Second, the statement concerned the alleged opinion of

21

Wilson's former attorney, who was no longer representing him at trial, a fact the jury was made aware of by hearing the attorney's name during the jail call. Accordingly, there was little danger the jury would have associated that statement with Wilson's counsel at trial. Third, despite his former attorney's alleged opinion, Wilson was able to present a defense at trial, and that defense worked to his favor. Wilson was able to present substantial evidence addressing his mental health around the time of the attack to establish that he did not act with premeditation and deliberation, a defense that proved successful, as the jury did not find true the premeditation and deliberation special allegation. In light of these considerations, it is not reasonably probable the jury would have reached a more favorable verdict had the statement been excluded.

Wilson also contends, for the first time on appeal, that the court's admission of his statement violated his due process rights. Assuming Wilson has not forfeited this challenge despite his failure to raise it before the trial court, the claim lacks merit. (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) Violations of state evidentiary rules generally do not violate a defendant's federal due process rights. (*Ibid*., citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70.)

## III. Admission of Prior Acts of Domestic Violence Under Evidence Code Section 1109

Wilson next contends the trial court abused its discretion in admitting evidence of his prior acts of domestic violence against Alice under Evidence Code section 1109. Specifically, Wilson argues the evidence should have been excluded under Evidence Code section 352 because it was inflammatory and unduly prejudicial, and its admission consumed an extraordinary amount of time.

Wilson also contends admission of the evidence of prior acts of domestic violence violated his due process and equal protection rights, but he acknowledges that similar claims have been rejected by the California Supreme Court and our sister Courts of Appeal. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 907, 922 (*Falsetta*) [upholding Evidence Code section 1108, which permits a trial court to admit evidence of prior, uncharged sexual offenses when the defendant is charged with committing a sexual

offense, under a due process challenge]; see also *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704 (*Cabrera*) [applying *Falsetta* to reject a defendant's due process challenge to Evidence Code section 1109]; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120 [same and recognizing binding effect of *Falsetta* on lower appellate courts under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455].)

### A. Relevant Proceedings

Before presenting its case-in-chief, the prosecution moved to introduce evidence of Wilson's prior acts of domestic violence against Alice under Evidence Code section 1109. Wilson filed a written objection to the prosecution's evidence of prior acts of domestic violence. The court found the prosecution complied with Evidence Code section 1109's requirements and admitted the evidence.[6]

While Alice was testifying about Wilson's prior acts of domestic violence, Wilson objected to the prosecution's use of photographs depicting the injuries Alice sustained during the June 2009 altercation. Wilson argued the photographs should be excluded or limited because their use consumed an undue amount of time and the prosecution's questioning about each photograph's individual details was inflammatory.

The court overruled Wilson's objection, finding the photographs were illustrative of the injuries Alice sustained during the prior attack and not particularly inflammatory because the injuries depicted were not nearly as severe as those suffered during the October 2010 attack, for which Wilson was being tried. The court went on, "In addition, under [Evidence Code section] 1109, obviously this comes in [as] propensity testimony, which is certainly something the jury can consider in corroboration of [Alice's] testimony, either as to the current offense or as to the priors, it's highly relevant under the circumstances." As to the photographs' potential prejudicial impact, the court noted:

---

[6] The evidence is summarized in detail in the factual background section entitled "Prior Incidents of Violence" above. We discuss the evidence here as necessary to address Wilson's contentions.

23

"And in terms of the prejudicial effect under [Evidence Code section] 352, it is not defined as something that is harmful to the defense. It is defined as something that has minimal probative value, but tends to inflame the passions and prejudices of the jury. And that's not what is happening here. She is simply showing the pattern of their relationship and of the defendant's conduct up to and including the current offenses."

### B. Standard of Review and Applicable Law

Generally, evidence of prior criminal acts is inadmissible to prove the defendant's conduct on a specific occasion. (See Evid. Code, § 1101, subd. (a); see also *People v. Cole* (2004) 33 Cal.4th 1158, 1194 (*Cole*).) However, such evidence, if relevant and not inadmissible under Evidence Code section 352, may be used to prove another fact at issue, such as motive or intent. (Evid. Code, § 1101, subd. (b); *Cole*, *supra*, 33 Cal.4th at p. 1194.) "To be admissible to show intent, 'the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance.' [Citations.]" (*Ibid.*)

Further, in a criminal action where the defendant is charged with committing an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible if it is not required to be excluded under Evidence Code section 352. (See Evid. Code, § 1109; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315.) We review the trial court's admission of evidence of prior acts of domestic violence under Evidence Code sections 352 and 1109 for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.Ap.4th 520, 531.)

### C. The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Wilson's Prior Acts of Domestic Violence Against Alice

Wilson argues evidence of his prior acts of domestic violence against Alice should have been limited because it had minimal probative value, was inflammatory, and its introduction consumed an undue amount of time. Because he did not dispute at trial that he attacked Alice in October 2010, he contends the only issue the jury needed to decide was whether he acted with the requisite intent to commit the charged offenses. According to Wilson, evidence of his prior acts of domestic violence did not reflect on

his intent during the October 2010 attack and was highly inflammatory because it portrayed him as a violent person who "repeatedly preyed upon Alice." We disagree.

First, the fact that Wilson did not dispute at trial that he attacked Alice did not remove that issue from the jury's consideration and did not preclude the prosecution from presenting relevant evidence addressing that issue. It is well established that once a defendant enters a plea of not guilty, he puts in issue "every material allegation of the accusatory pleading." (*People v. Rowland* (1992) 4 Cal.4th 238, 260 (*Rowland*), quoting § 1019.) A defendant cannot admit a material allegation in order to unilaterally handcuff the prosecution's presentation of evidence. (See *People v. Scott* (2011) 52 Cal.4th 452, 471 ["[T]he general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect would be to deprive the state's case of its persuasiveness and forcefulness."].) Accordingly, Wilson's decision to not challenge the allegation that he attacked Alice did not automatically render irrelevant the prosecution's evidence addressing that issue, including his prior acts of domestic violence against Alice. (See *Rowland*, *supra*, 4 Cal.4th at p. 260 ["Such a fact remains 'disputed' until it is resolved."].)

Second, the evidence of Wilson's prior acts of domestic violence was relevant to the issues of intent and Wilson's propensity to commit the charged offenses. In order to be admissible to prove intent, prior incidents of violence need only share the "least degree of similarity" with the acts underlying the charged offenses. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) "'[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act. . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]'" (*Ibid.*)

Wilson's prior acts of domestic violence against Alice were sufficiently similar to the underlying acts in this case to support the inference that he harbored the same intent

25

in each instance.  First, all of the acts were committed against the same victim.  Second, during each attack, including the October 2010 incident, Wilson engaged in the same pattern of abuse, often restraining Alice and then repeatedly striking her face.  In three out of the four prior incidents, Wilson also choked or attempted to suffocate Alice.  Third, Wilson's abuse during each instance of violence, including the October 2010 incident, was preceded or accompanied by similar behavior: he would accuse Alice of sleeping with other people and stealing his money.  These patterns are sufficiently similar to render the evidence of Wilson's prior acts of domestic violence admissible, subject to Evidence Code section 352's balancing test.  (See *People v. Linkenlauger* (1995) 32 Cal.App.4th 1603, 1613 (*Linkenlauger*) [evidence of discord between defendant and wife and defendant's prior assaults against wife properly admitted to show ill will and motive, namely defendant's intent to beat, torture, and murder his wife].)

The evidence of Wilson's prior acts of domestic violence was also admissible to prove his propensity to commit the underlying charges in this case.  Under Evidence Code section 1109's exception to the general prohibition against propensity evidence, the prosecution may introduce evidence of prior charged and uncharged acts of domestic violence to establish the defendant's tendency to commit such crimes.  (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232.)  """"The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases.  Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity.  Without the propensity inference, the escalating nature of domestic violence is likewise masked." . . .'  [Citation.]"  (*Cabrera, supra,* 152 Cal.App.4th at pp. 705-706.)  For the same reasons stated above, Wilson's prior assaults against Alice are sufficiently similar to be admissible to prove his disposition to commit such crimes.  Indeed, consistent with the court's reasoning in *Cabrera,* Wilson's acts of violence generally increased in intensity, with the October 2010 incident being the most severe and violent.

The trial court also properly determined that the probative value of Wilson's prior acts of violence was not substantially outweighed by the time it took to introduce the evidence or the prejudicial effect of the evidence. First, the evidence was highly probative, as it concerned the same victim and involved very similar acts of violence that generally escalated in severity with each successive incident. (See *Linkenlauger*, *supra*, 32 Cal.App.4th at p. 1613; *Cabrera*, *supra*, 152 Cal.App.4th at pp. 705-706.)

Second, introducing the evidence did not necessitate an undue consumption of time; the prosecution introduced the evidence through a single witness, Alice, and it did not call the various law enforcement officers who responded to the prior assaults or the various medical officials who tended to Alice's injuries. Wilson contends introducing the evidence consumed an exorbitant amount of time, as evidenced by the fact that the testimony concerning the prior assaults spans 37 pages, nearly the same amount of pages covering the testimony concerning the underlying assault. This argument is not convincing. The evidence of the prior assaults consisted of four separate assaults, while the underlying charges involved only a single assault.

Third, the use of Wilson's prior assaults was not unduly prejudicial to Wilson. The prior incidents were not more inflammatory or aggravated than the underlying attack. (*Cabrera*, *supra* 152 Cal.App.4th at p. 706 ["[W]e note the [prior] incidents . . . were in no sense more aggravated or inflammatory than the charged offense"].) In the prior incidents, Wilson's attacks were shorter and Alice's injuries were less severe than in the underlying incident. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1150.)

Because the probative value of Wilson's prior acts of domestic violence significantly outweighed any potential prejudice, the trial court did not abuse its discretion in admitting those acts.

D. *Admission of Wilson's Prior Acts of Domestic Violence Did Not Violate His Due Process and Equal Protection Rights*

Wilson also contends admission of his prior acts of domestic violence violated his due process and equal protection rights. He concedes that similar due process and equal

27

protection challenges to Evidence Code sections 1108[7] and 1109 have been uniformly rejected by California courts but raises the argument to preserve the claim for federal habeas review.

Wilson contends Evidence Code sections 1108 and 1109 do not sufficiently safeguard against undue prejudice from the introduction of propensity evidence. With respect to Evidence Code section 1108, the California Supreme Court in *Falsetta* resolved this issue, holding that Evidence Code section 352 provides sufficient safeguards to protect against the admission of unduly prejudicial evidence of prior sexual offenses. The court observed: "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) The court reasoned this balancing requirement "provides a safeguard that strongly supports the constitutionality of [Evidence Code] section 1108." (*Id*. at p. 916.)

Although *Falsetta* addresses Evidence Code section 1108 only, the Courts of Appeal that have resolved identical challenges to section 1109 have all extended the reasoning in *Falsetta* to hold section 1109 does not violate due process or equal protection. (See e.g., *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14; *People v. Johnson, supra,* 185 Cal.App.4th at p. 529; *Cabrera*, *supra*, 152 Cal.App.4th at p. 704; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096.) We see no reason to depart from these holdings.

---

[7] Evidence Code sections 1108 and 1109 operate nearly identically, with section 1108 applying to sexual offenses, as opposed to domestic-violence offenses.

**IV.     Admission of Expert Testimony Concerning Battered Woman Syndrome**

Wilson next contends the trial court erred in admitting expert testimony concerning the effects of battered woman syndrome on victims of domestic violence. Wilson argues Dr. Baca's testimony should have been excluded because it was not relevant to any material issue and was highly prejudicial. The People contend the trial court properly admitted Dr. Baca's testimony because it was relevant to explain why Alice remained in her relationship with Wilson despite his pattern of physically abusing her and why she delayed in alleging that Wilson had raped her.

*A.  Relevant Proceedings*

Prior to trial, Wilson objected to the prosecution's introduction of Dr. Baca's testimony addressing battered woman syndrome.[8] He argued the evidence was irrelevant because Dr. Baca never personally interviewed Alice and her testimony addressed battered woman syndrome generally, and not whether Alice in fact suffered battered woman syndrome at the time of Wilson's attack. Wilson also argued the prosecution failed to provide timely notice that Dr. Baca would be testifying when it informed Wilson's counsel that she would be called as a witness a little more than a week before trial was set to begin.

The court overruled Wilson's objection. First, it found the scope of Dr. Baca's testimony was appropriate because, as an expert on battered woman syndrome, she could not testify to the ultimate issue of whether Alice suffered from the syndrome; rather, she could only inform the jury about the general characteristics of the syndrome. With respect to Wilson's timing argument, the court found the prosecution provided adequate notice because it had informed Wilson that it intended to call a different battered woman syndrome expert in September 2012, more than six months before trial, and Dr. Baca's testimony was not substantively different than that expert's proposed testimony.

---

[8]     Dr. Baca's testimony is summarized in the factual background section above.

*B.      Standard of Review and Applicable Law*

Under Evidence Code section 1107, the prosecution may introduce expert testimony concerning battered woman syndrome, "including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." (Evid. Code, § 1107; *Riggs*, *supra*, 44 Cal.4th at p 293 ["[E]xpert [battered woman syndrome] testimony is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand."].) For such testimony to be admissible, there must be sufficient evidence supporting the claim that the syndrome applies to the victim, and there must be a contested issue to which the testimony is probative. (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 595 (*Gadlin*).) We review the trial court's admission of expert testimony for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.)

*C.  The Trial Court Did Not Abuse Its Discretion in Admitting Expert Testimony on Battered Woman Syndrome*

Wilson contends Dr. Baca's testimony concerning battered woman syndrome was irrelevant and should have been excluded. He argues Alice's credibility was not at issue, pointing to the fact that she reported several of his acts of abuse to the police, including the October 2010 attack, and she never recanted any of her claims of assault. He also points to the fact that he did not dispute at trial that he was the person who attacked Alice during the October 2010 incident. According to Wilson, the only issue the jury needed to decide was whether he committed the underlying offenses with the necessary intent, an issue that battered woman syndrome testimony cannot be used to prove. We disagree with Wilson's contention that the testimony should have been excluded.

Although Alice did not recant her claims that Wilson assaulted her in October 2010, her credibility concerning the claim of rape was at issue. Generally, expert testimony on battered woman syndrome is admissible in a prosecution for domestic assault even if the victim has not recanted her prior allegations at trial, so long as the victim's credibility is at issue or it is necessary to explain the victim's decision to resume

30

her relationship with the abusive defendant. (*Gadlin*, *supra*, 78 Cal.App.4th at p. 595; see also *Riggs*, *supra*, 44 Cal.4th at p. 293.)

As Wilson pointed out at trial, Alice waited a considerable amount of time before she alleged that Wilson raped her during the attack. During cross-examination, Wilson questioned Alice as to this delay in an attempt to attack her credibility. Wilson also questioned Alice about her motivations for staying in a relationship with him. Specifically, he questioned her about what types of gifts she received from him and how frequently she would receive them. Dr. Baca's testimony was relevant to these issues, as it offered an explanation for why victims experiencing battered woman syndrome often remain in abusive relationships and sometimes delay in reporting alleged incidents of violence and sexual assault. Among other explanations, Dr. Baca explained that victims are sometimes too embarrassed to report such activities to family members or law enforcement officials, especially if considerable time has passed since the incidents occurred, because they believe they will be viewed as having enjoyed the abuse. This testimony was relevant to the issue of Alice's credibility, especially as it related to her allegation that Wilson had raped her, as well as to explain why she resumed contact with Wilson shortly after he was released from custody only a month before the October 2010 attack. (*Gadlin*, *supra*, 78 Cal.App.4th at p. 594.)

Wilson next argues any slight probative value the testimony may have had was substantially outweighed by its prejudicial effect in portraying Alice as a sympathetic victim and Wilson as a psychopathic and violent defendant. We disagree. Dr. Baca limited her testimony to the characteristics of battered woman syndrome from the point of view of a hypothetical relationship, which is necessary to explain a victim's behavior in light of the syndrome. (*Gadlin*, *supra*, 78 Cal.App.4th at p. 595.) She did not testify to Wilson's specific conduct at issue in this case, and she did not offer her opinion as to Alice's state of mind before, during, or after the October 2010 incident. Further, Dr. Baca's testimony was not inflammatory, as it did not discuss hypothetical abusive relationships that involved more violent behavior than that at issue in Wilson's case.

31

## V.    The Prosecutor's Closing Argument

Wilson next contends the prosecutor engaged in misconduct during closing argument by arguing facts she knew to be untrue, appealing to the emotions and fears of the jury, and suggesting, without supporting evidence, that Wilson previously committed acts of domestic violence against other people.

### A.  *Standard of Review*

"'The applicable federal and state standards regarding prosecutorial misconduct are well established.  "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"  [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"  [Citations.]'"  (*People v. Hill* (1998) 17 Cal.4th 800, 819.)  Generally, a defendant may not raise a claim of prosecutorial misconduct on appeal unless he timely objected to the alleged misconduct at trial.  (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

A prosecutor enjoys wide latitude during closing argument.  (*People v. Williams* (1997) 16 Cal.4th 153, 221.)  Her argument may be vigorous and incorporate appropriate epithets as long as it amounts to fair comment on the evidence, and it may include reasonable inferences drawn for the evidence.  (*Ibid.*)  "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)  "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'  [Citation.]"  (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)

### B.  *The Prosecutor's Argument*

Wilson takes issue with three portions of the prosecutor's closing argument, contending they constitute misconduct and require reversal of his conviction.  First, he

argues the prosecutor misstated the evidence when she stated the following: "[Wilson] has become absolutely convinced that [Alice] is conspiring against him. He's become obsessed with it. And he repeats it over and over and over, such that his wife . . . who he's staying with, decides to take him to Henry Mayo Hospital in Newhall. They see him. [¶] He tells them, 'I'm suffering from bipolar. I've been diagnosed with bipolar.' And they give him a sedative, and they release him. They don't see any other reason to keep him. He indicates he is not a danger to himself, and he indicates he is not a danger to anybody else so they release him."

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) Wilson did not make an objection or request an admonition as to this portion of the prosecutor's argument. Accordingly, he forfeited any claim of prosecutorial misconduct as to that argument. (*Williams*, *supra*, 16 Cal.4th at pp. 221-222; *People v. Sully* (1991) 53 Cal.3d 1195, 1235.) In any event, reviewing his claim on the merits, the prosecutor did not commit misconduct during this portion of her argument.

Wilson argues the prosecutor's statements were inaccurate and misstate the evidence because Dr. Rosenberg testified that Wilson did in fact indicate that he was a danger to himself and others while he was at Henry Mayo Hospital because he exhibited suicidal thoughts and was in the throes of a manic episode. Dr. Rosenberg based this testimony on a report he wrote after he reviewed Wilson's records from Henry Mayo Hospital. According to Dr. Rosenberg, Wilson's treating doctor at Henry Mayo recognized that Wilson had a history of mania and bipolar disorder. The treating doctor also observed that Wilson exhibited suicidal thinking. However, the treating doctor concluded that, based on his personal observations, Wilson would not pose a danger if released from the hospital.

Although the mental-health experts who testified on Wilson's behalf disagreed with the hospital's assessment of Wilson's condition, that does not mean the prosecutor's

statement about the hospital's conclusions was inaccurate or false. Accordingly, the prosecutor did not err when she commented on those conclusions.

Next, Wilson argues the prosecutor improperly appealed to the emotions and fears of the jury when she stated: "He's an incredibly dangerous, narcissistic, violent person. I can't even call him a man. He is a violent person. That's what this is about, not some bipolar manic episode. He's vengeful, and he's persistent. And he has illustrated that over and over through time, whether it's finding out where she lives when she leaves him and following her through Nevada as she changes her address over and over, or whether it's beating her in September, October, December, June, six weeks . . . after he gets out of custody. He will do it again. It's what he does. It's who he is." At this point, Wilson objected, and the court overruled the objection. The prosecutor continued: "This needs to stop. It needs to stop now. Ladies and gentleman, it is your job to hold him accountable for what happened on October 15th, 2010. Send him that message: This needs to stop now."

Wilson contends the prosecutor's comments constituted misconduct because they asked the jury to act as the community's conscience, incited the jury's passions and prejudices, suggested that the jury had a direct stake in the outcome of the case, and hinted at the potential consequences of the jury's verdict. We disagree that this portion of the prosecutor's argument was misconduct.

The prosecutor's argument was reasonably based on the evidence and not calculated to incite the emotions of the jury. The argument focused on relevant aspects of Wilson's behavior that are supported by the record: (1) his persistence in following Alice after she first tried to end their relationship; (2) his anger and jealousy problems; and (3) his repeated, violent outbursts that were triggered by his anger and jealousy problems.

Additionally, any appeal the prosecutor may have made to the jury to act as the community's conscience in putting a stop to Wilson's violent behavior was grounded in the facts of the case. (See *People v. Lucero* (2000) 23 Cal.4th 692, 734 ["It was proper for the prosecutor to describe the jurors as the 'conscience of the community.'"].) Unlike the arguments at issue in the two federal circuit court cases Wilson relies on, the

34

prosecutor did not appeal to broader community interests that were irrelevant to Wilson's case or likely to incite or mislead the jury with respect to its role as the fact-finder. (See *U.S. v. Solivan* (6th Cir. 1991) 937 F.2d 1146, 1152 [It is not improper per se for a prosecutor to appeal to the jury as the community's conscience, but "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking"]; *U.S. v. Barker* (6th Cir. 1977) 553 F.2d 1013, 1025 [prosecutor committed misconduct when she told the jury that if it could not convict the defendant of bank robbery, "we might as well open all the banks and say, 'Come on and get the money, boys, because we'll never be able to convict them.'"].)

Finally, the prosecutor did not suggest that the jury had a direct stake in the outcome of Wilson's case; rather, she reminded the jury of its role as the fact-finder. In light of the foregoing, this portion of the prosecutor's argument was proper.

Finally, Wilson argues the prosecutor improperly suggested to the jury that he had committed prior acts of violence against other unidentified individuals, for which he had never been held responsible: "Mind you, this is the first person who's actually ever[] gotten him in trouble. So it's really important that you understand the basis for this, sort of, idea that he has. It's not out of nothing. It's certainly not out of nothing. It becomes something way more than it initially should have been – or would have been." Again, Wilson did not object to this portion of the prosecutor's argument. Accordingly, he forfeited his claim of misconduct. (*Williams*, *supra*, 16 Cal.4th at pp. 221-222; *Sully*, 53 Cal.3d at p. 1235 [defendant forfeits claim of misconduct where he failed to object during argument and the alleged misconduct could have been remedied by a timely admonition].)

Moreover, the prosecutor's argument cannot reasonably be construed to suggest that Wilson committed violence against anyone but Alice. Rather, the remarks appear to allude to the escalation of Wilson's violent assaults on Alice, not to unproven assaults on different, unspecified people. In any event, after the jury heard closing arguments, the trial court instructed the jury that the statements made by the attorneys are not evidence.

35

Accordingly, it is not reasonably likely the jury construed the prosecutor's comment in an objectionable fashion. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)

## VI.    The Trial Court's "Firecracker" Instruction

Wilson next contends the trial court erred in providing the jury with a "firecracker" instruction after the jury requested direction from the court about what it should do in the event it could not reach a verdict on any specific charge against Wilson. Wilson argues the court's instruction was coercive and improper for the following reasons: (1) it impermissibly pressured the jury to reach a verdict; (2) it encouraged the jurors to abandon their individual beliefs in order to reach a verdict; and (3) it impermissibly conveyed the judge's personal view to the jury. In short, Wilson argues the instruction was an improper *Allen*[9] charge. We disagree.

### A.  Relevant Proceedings

The jury began deliberating on April 16, 2013. That same day, it asked to review Alice's testimony concerning the October 2010 attack and her 29-page report recounting the attack. The next day, the jury requested clarification of Wilson's diagnosis for bipolar disorder and "the decision for counts 1, 2, and 6." The jury also requested clarification of the instruction addressing the specific-intent element of the crimes alleged in those counts. On April 18, the jury asked to hear Dr. Poparini's testimony during cross-examination. That same day, it requested a CD player to listen to Wilson's jail calls.

On April 19, the jury requested clarification of the instructions addressing the elements of attempted murder; the definitions of premeditated, deliberate, and willful; and the elements of rape. That same day, the jury submitted a question asking, "What do we do if there is a dead-lock or non-agreement on anything or any specific count?" After receiving this question, the court proposed to counsel that it would provide a supplemental instruction based on the instructions approved in *People v. Whaley* (2007) 152 Cal.App.4th 968 and *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*). Wilson

---

[9]     *Allen v. United States* (1896) 164 U.S. 492.

36

objected, arguing the proposed instruction was one-sided. He requested that, if the trial court decided to provide the instruction, it add language informing the jurors of the importance of their individual opinions.

The court overruled Wilson's objection and denied his request to add language to the instruction. It stated: "I am not going to alter the instruction that's been approved of twice in published opinions and numerous times in unpublished opinions by the Court of Appeal statewide and in this district in particular. I am going to read the instruction as written. [¶] It is very inclusive of a lot of the instructions that they get. I don't believe that it is in any way one-sided or coercive at all. As a matter of fact, it's a very well-built admonition that basically just encourages [the jurors] to perhaps think of other methods to use and also reminds them of their duties, especially under the circumstances where they haven't given us a numerical breakdown of how they may be divided." The court then read the jury the following instruction:

"It has been my experience on more than one occasion that a jury which initially reported that it was unable to reach a verdict was ultimately able to arrive at verdicts on one or more of the counts before it.

"To assist you in your further deliberations, I'm going to further instruct you as follows:

"Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict, regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh, and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs. You should not hesitate to change a view you once held if you are convinced that it is wrong or to suggest other jurors change their views if you are convinced that they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.

37

"As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all evidence with your fellow jurors.

"It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment. Both the People and the defendant are entitled to the individual judgment of each juror.

"If there is anything that this court can do to assist you in performing your duties, please do not hesitate to let me know. At your request, you can be provided with readback of testimony, further explanation of legal concepts, further instructions, or further arguments by the attorneys on any point or topic that you request.

"As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

"May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider changing the methods you've been following, at least temporarily and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role-playing, by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the others' positions.

"By suggesting that you should consider changes in your methods of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations. I merely suggest that you may find it productive to do whatever is necessary to ensure that each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you reread CALJIC instruction 1.00, CALJIC instruction 17.40, and CALJIC instruction 17.41. These instructions pertain to your duties as jurors and make recommendations on how you should deliberate.

"The integrity of a trial requires that all jurors at all times during their deliberations conduct themselves as required by the instructions. CALJIC instruction 1.00 defines the duties of a juror.

"The decision the jury renders must be based on the facts and on the law. You must determine what facts have been proved from the evidence received in this trial and not from any other source. A fact is something proved by the evidence or by stipulation.

"Second, you must apply the law that I state to you to the facts as you determine them and in this way, arrive at your verdict. You must accept and follow the law as I state it to you regardless of whether you agree with the law.

"If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

"CALJIC 17.40 defines the jury's duty to deliberate. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

"CALJIC 17.41 is an instruction which recommends how jurors should approach their task. You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions that I have made in these instructions now presented to you.

"I hope my comments and suggestions may have been of some assistance to you.

"You are now ordered to continue your deliberations at this time. If you have other questions, concerns, requests, or any communication you desire to report to me, please put those in writing on the form that has been provided to you. Have them signed and dated by your foreperson and then please notify the bailiff."

B. *Standard of Review and Applicable Law*

Under section 1140, the trial court has discretion to choose whether to declare a mistrial or order further deliberations when a jury indicates it is deadlocked as to one or more charges against the defendant. (*People v. Bell* (2007) 40 Cal.4th 582, 616.)

39

"'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency . . . , the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.'"'" [Citation.]" (*Ibid*.)

It is error for the trial court to give a deadlocked jury a "dynamite" or "*Allen*" instruction that: (1) contains a discriminatory admonition to minority jurors to rethink their position in light of the majority's views; (2) asserts that the case must at sometime be decided, or if the jury does not reach a decision, that the case will necessarily be retried; or (3) references the expense and inconvenience of a retrial. (*People v. Santiago* (2009) 178 Cal.App.4th 1471, 1475, citing *People v. Gainer* (1977) 19 Cal.3d 835, 845, 852 (*Gainer*) disapproved of on other grounds in *People v. Valdez* (2012) 55 Cal.4th 82, 163-165 (*Valdez*).) It is not error, however, for the court's instruction to acknowledge that majority and minority groups of viewpoints may exist among the deliberating jurors, so long as the instruction does not ask only one group to reconsider its position. (*Valdez*, *supra*, 55 Cal.4th at p. 163 [disapproving of dicta in *Gainer* stating that it is error for the trial court to acknowledge the existence of majority and minority groups of viewpoints among the deliberating jurors].)

### C. The Trial Court's Instruction Was Proper

Wilson acknowledges that a nearly identical instruction was upheld in *Moore*. However, he contends that case was wrongly decided and urges that we hold the trial court erred in reading the jury its "firecracker" instruction because the instruction was coercive, failed to remind the jurors not to abandon their individual convictions, and improperly referenced the judge's personal experience. We disagree.

In *Moore*, the trial court read the jury an instruction nearly identical to the one read in this case. (*Moore*, *supra*, 96 Cal.App.4th at pp. 1118-1119.) The defendant contended on appeal that the instruction violated *Gainer*'s prohibition against *Allen* charges because it was coercive. (*Id*. at p. 1120.) The Court of Appeal rejected the

40

defendant's argument and commended the trial court for "fashioning such an excellent instruction." (*Id*. at pp. 1120-1122.)

The court reasoned the instruction was proper for several reasons. First, the instruction did not tell the jury that a verdict had to be reached at some point. (*Moore*, *supra*, 96 Cal.App.4th at p. 1121.) Rather, it instructed the jurors that they should reach a fair and impartial verdict only if they were able to do so. (*Ibid*.) Second, the instruction reminded the jurors not to abandon their individual judgments in attempting to reach a unanimous verdict. (*Ibid*.) Third, the instruction did not suggest that there would be any negative consequences, either to the judicial system generally or to the individual parties and jurors, should the jury not reach a verdict. (*Ibid*.) Approving the instruction, the Court of Appeal observed that the trial court "took great care in exercising its power 'without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency. . . . Nothing in the trial court's comment . . . properly may be construed as an attempt to pressure the jury to reach a verdict. . . .' [Citation.]" (*Ibid*.)

The trial court's instruction in the instant case was proper for the same reasons. Contrary to Wilson's argument, the instruction did not coerce the jury into reaching a verdict; it did not inform the jury that a verdict was necessary, and it did not suggest that there would be any negative repercussions should the jury ultimately not reach a verdict.

Wilson also contends the instruction "failed to tell the jury not to surrender their individual opinions in favor of the majority." But the instruction stated just that: "It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges if you can do so without violence to your individual judgment." Additionally, the instruction did not single out minority jurors and urge them to reconsider their viewpoints in light of those held by the majority jurors. Rather, it suggested that each juror reexamine his or her own views and those of his or her fellow jurors, while not abandoning his or her individual judgment, a type of instruction approved by our Supreme Court in *Valdez*. (See *Valdez*, *supra,* 55 Cal.4th at p. 162.) The trial court's instruction was well within its discretion.

41

## VII. Cumulative Error

Wilson finally contends that even if the alleged individual errors addressed above are harmless when viewed in isolation, the cumulative effect of such errors warrants reversal of his conviction. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

Because the only error we find – admission of Wilson's comment about the former attorney's statement – was harmless, there is no "cumulative" error.

## DISPOSITION

The judgment is affirmed.

IWASAKI, J.[*]

**We concur:**

PERLUSS, P. J.                    ZELON, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.